UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| BIG VISION PRIVATE LIMITED | ) | No. 11 Civ. 8511-WHP-THK |
|  | ) |  |
| Plaintiff, | ) | **ECF CASE** |
|  | ) |  |
| v. | ) | COMPLAINT FOR |
|  | ) | DAMAGES AND |
| E. I. DU PONT DE NEMOURS | ) | INJUNCTIVE RELIEF |
| AND COMPANY | ) |  |
| Defendant. | ) |  |

_____

Plaintiff Big Vision Private Limited ("Big Vision") alleges as follows:

## **<u>INTRODUCTION</u>**

1.      Plaintiff Big Vision is one of India's largest digital printing companies.  It is a leader in the development and marketing of large-format commercial advertising banners, a category that includes, most prominently, billboards.  The banner industry consumes enormous quantities of toxic polyvinyl chloride – commonly known as "PVC" – which has long been the dominant plastic chemical used to coat commercial banners.  Although attempts had been made over the years to develop more eco-friendly products, no one had succeeded in producing a competitively priced banner of sufficient quality.  In 2007 and early 2008, however, Big Vision developed a revolutionary alternative that promised to turn the market on its head:  A high-quality, reasonably priced banner that, unlike PVC, is completely recyclable.  Big Vision also developed a detailed, proprietary business model for the use, collection, and recycling of its new banner material.  In 2008 and 2009, Big Vision tested and refined its innovations at a facility in New York, intending to exploit the finished product as the world's first commercially viable, fully recyclable banner.

2.      Just before it began this testing, Big Vision was introduced to defendant E.I. Du Pont de Nemours and Company ("DuPont"), which manufacturers a resin that Big Vision's scientists believed might improve the banner's ability to hold and display inkjet printing. DuPont told Big Vision that, in light of the potential market for its recyclable banner (and the corresponding new market for DuPont's resin), DuPont was interested in seeing Big Vision's project succeed.  For its part, Big Vision was pleased to explore the possibility of a business arrangement with DuPont, and permitted certain DuPont representatives to attend the product testing in New York.

3.      Given the value of its intellectual property and the considerable investment of resources it had made in the project, Big Vision wanted to ensure that DuPont could not appropriate for its own benefit the fruits of Big Vision's labors.  Similarly, DuPont represented to Big Vision that DuPont wanted to keep the parties' communications confidential.  The parties therefore negotiated and executed a non-disclosure agreement, which expressly provided that any and all confidential information either party learned from the other could be used only to pursue "a possible business opportunity of mutual interest."  The agreement further provided that neither party was permitted to "disclose the Confidential Information to any third party," including, in particular, "any patent office."  It also obligated each party to "promptly disclose the results of all tests and experiments" individually conducted by either party and, in particular, any actual "products made therefrom."  On the basis of its understanding that all information that was exchanged at the trials would remain confidential, Big Vision welcomed DuPont into the trial facility, shared information concerning the project, and answered DuPont's questions, all in furtherance of the parties' agreement to pursue an opportunity of "mutual interest."

4.      As has now become clear, however, DuPont was so impressed by what it learned at the trials Big Vision conducted, and was so dismissive of its obligations to Big Vision, that it determined to go ahead and pursue its *own* interest, rather than the parties' *mutual* interest. Accordingly, in brazen violation of the non-disclosure agreements, DuPont secretly set out to enter the banner market on its own – using Big Vision's invention and passing it off as DuPont's. In furtherance of its plan, DuPont (1) filed for United States and international patents, which described the precise innovation that DuPont had learned at the Big Vision trials; (2) proceeded to exploit Big Vision's confidential information to develop and market a line of its own recyclable banner products that directly compete with Big Vision; and (3) shared all of this information with third parties in order to maximize the profitability of its own line of products. Big Vision seeks redress for DuPont's multiple violations of Big Vision's rights under the law.

## NATURE OF THE ACTION

5.      This is a civil action seeking damages and equitable relief for DuPont's breach of contract, and for unfair competition and misappropriation of trade secrets.  Big Vision also seeks punitive damages on the basis of DuPont's gross, wanton and egregious conduct.

## PARTIES, JURISDICTION AND VENUE

6.      Plaintiff Big Vision is a private company incorporated in India, with its principal place of business in Mumbai.  Big Vision is among India's leading providers of digital printing services, and is particularly well known for its work with large-format outdoor printing, including banners.  Among Big Vision's major international customers are Unilever, PepsiCo, Nestle, Warner Bros., Paramount Pictures, and Merrill Lynch.

7.      Defendant DuPont is a Delaware corporation with its principal place of business in Wilmington, Delaware.

8.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), because this is an action between a citizen of a foreign state – Big Vision, a citizen of India – and a citizen of a state – DuPont, a citizen of Delaware – and the amount in controversy exceeds $75,000.

9.      The Court has personal jurisdiction over Defendant.  Defendant has offices and is registered to do business in New York.  Defendant regularly solicits business in New York, regularly enters into contracts and other arrangements in and with residents of New York, and derives substantial revenue from goods sold in New York, including products such as Tyvek Vivia, Imvelo, and Imvelo Deco, which, as described below, are at issue in this case.  Moreover, many of the key interactions between Plaintiff and Defendant occurred in New York. Defendant's conduct has caused and continues to cause injury to Plaintiff in New York.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c).  Among other contacts, Defendant owns or rents property in this District; conducts substantial business in this District; advertises and sells products in this District (including products at issue in this case); is listed on the New York Stock Exchange, which is located in this District; and has a designated agent for service of process in this District.

## BIG VISION DEVELOPS A NEW, ECO-FRIENDLY BANNER MATERIAL

11.     The global market for banner displays is large and growing.  The United States market alone is in the billions of dollars, with an average annual growth rate of 3.5% over the past two decades.

12.     Historically, the most common construction of commercial banners has been a polyester fabric base (or "substrate") coated with polyvinyl chloride ("PVC").  The principal advantage of this combination of materials is that it is sufficiently durable for most outdoor,

large-format applications, and it is relatively inexpensive to produce.  One the other hand, it is expensive and environmentally toxic to dispose of banners that are made this way.  Polyester and PVC come from different chemical families; therefore, once they are combined in a banner they cannot easily be broken back down into their constituent chemicals for recycling or reuse.  When PVC-coated polyester banners are relegated to landfills, they do not decompose and may release hazardous materials into the surrounding soil.  Concerns regarding PVC-coated polyester are increasingly limiting the material's appeal for use in banners.  Governments around the world are regulating its use, and the cost of its disposal is growing.

13.     The environmental impact of PVC-coated polyester is especially severe in India where, each year, the outdoor advertising industry uses approximately 2.4 billion square feet of the material, resulting in more than 105,000 tons of hazardous waste.  Big Vision, which was formed in 1998, had spent years using PVC-based products.  It was experienced with the technical processes required to make banners, among them "extrusion coating" – the process of directly coating a fabric, like polyester, with a plastic polymer, like PVC, in order to render the fabric suitable for digital inkjet printing.  Big Vision was acutely aware that concerns about the future of PVC-coated polyester created a substantial business opportunity for a more eco-friendly alternative.

14.     In 2007, Big Vision began experimenting with different types of materials as the basis for a high-quality, reasonably priced, recyclable alternative to PVC-coated polyester banners.  Big Vision recognized that, because the primary impediment to recyclability was the chemical incompatibility between the substrate of a banner and its coating, the key to a more eco-friendly product lay in developing a banner in which the fabric and the coating were made from a similar chemical base.  Big Vision explored, among other things, the concept of a banner

made from a plastic known as polyolefin ("PO"), the most common varieties of which are polyethylene ("PE") and polypropylene ("PP"). Polyolefin is a versatile form of plastic, which Big Vision thought might be fashioned into *both* the fabric substrate for a banner *and* a coating capable of holding the ink.

15. After conducting extensive research, Big Vision concluded that a PO-based banner material could be superior to PVC-coated polyester in two important respects. First, PO can be produced with considerably less energy than is typically required to produce PVC-coated polyester. Second, PO is significantly more eco-friendly: Its carbon footprint is approximately 60% less than standard PVC, it is entirely free of toxic chlorine and, crucially, it is 100% recyclable. Because of both its reduced energy requirements and its recyclability, PO held the potential to be a cost-effective alternative to PVC-coated polyester.

16. Others in the industry had attempted to manufacture commercially viable banners made from entirely PO materials. Those efforts failed, however, principally because they used unsuitable "woven" PO-fabrics to construct the underlying substrate. In addition, PO is a relatively nonporous substance, and therefore is not readily capable of accepting or holding inks. Finally, although these early PO banners were recyclable in theory, no one had yet devised a business model to make the recycling process practical and economically feasible.

17. In late 2007, through groundbreaking research and development, and at great expense, Big Vision discovered solutions to these problems. Rather than using a woven PO-fabric, Big Vision devised a way to construct a substrate from "non-woven" PO fabric, which is light enough and of a sufficient quality to compete with the traditional (but non-recyclable) polyester material.

18.   Big Vision also discovered how to make the non-woven PO banner capable of displaying text and images at a quality that would be acceptable to potential customers.  Big Vision combined a substance called low density polyethylene ("LDPE") with various additives, spread it on to a film, and then subjected the material to an electric shock treatment that rendered the film sufficiently porous to accept ink.  That film could then be laminated on to a non-woven PO-fabric substrate to create a recyclable banner that could compete favorably on both cost and quality with existing PVC-coated polyester banners.

19.   Big Vision also determined, however, that there were various respects in which it could improve this innovation.  First, in April 2008, Big Vision successfully tested an "extrusion coating" method of affixing a porous coating of LDPE to a non-woven PO-fabric substrate.  This method enabled Big Vision to cut out the lamination step from the manufacturing process.

20.   Second, Big Vision suspected that its recyclable banner could further be improved by adding an "ethylene acrylic resin" to coat the non-woven PO fabric.  Acrylic resins are adhesive substances that Big Vision believed could enhance ink saturation and smudge-resistance on the banner during and after printing; those made from ethylene are of a similar chemical family as LDPE and PO and would not, therefore, pose a barrier to recyclability.  Big Vision began asking various ethylene acrylic-resin manufacturers whether they would be willing to supply Big Vision with samples for testing on its prototype banner.

21.   Third, Big Vision figured out that, through a process known as "downgauging" – which varies the relative amounts of LDPE, ethylene acrylic resin, and other additives that are used in a coating – Big Vision could create different grades of recyclable banners capable of meeting different customer price points.  Most important, Big Vision determined how to make cost-effective banners that require only the smallest amount of ethylene acrylic resin, which is

7

expensive, by increasing the relative amounts of less-expensive LDPE and other additives. Through the use of downgauging, Big Vision was able to identify a number of potential coating combinations for its recyclable banners, so that it could tailor its offerings to different circumstances and opportunities.

22.     Big Vision also developed a sophisticated business model for taking a recyclable banner to market.  Using proprietary research, it segmented the world market for banners by region and price-point, identified the main drivers of price and value, and modeled a production chain that would be viable and profitable.  Central to this chain were (1) a process for grinding and melting used banners for reuse and (2) a buy-back system that created incentives for every player in the process, from printers to installers to corporate end-users, to share responsibility for the various tasks required to implement a recycle loop.

23.     Big Vision took pains to ensure the secrecy of its valuable innovations.  Only a handful of Big Vision's approximately seventy employees had access to the research done on PO banners, and few employees worked on the plans to implement a recycling process.  None of this information was shared with outsiders unless strict confidentiality or non-disclosure agreements were executed.  Moreover, when Big Vision's research and trials required access to facilities or machines owned by other companies in India, Big Vision purposely and deliberately segregated those activities and conducted them at a variety of different locations so that no one unaffiliated with the company would discover what Big Vision was developing.

## THE NON-DISCLOSURE AGREEMENTS

### The Parties Are Introduced

24.     Encouraged by the results of the testing it performed in India, in early 2008, Big Vision purchased land suitable for a 100,000 square-foot facility to be used to manufacture its

8

new banner material.  It also contacted certain industrial equipment manufacturers that might be capable of building a high-capacity extrusion machine to coat non-woven PO fabric with the necessary LDPE, ethylene acrylic resin, and other additives.  Among them was a Fulton, New York equipment manufacturer called Davis-Standard.  After some preliminary discussions, the parties agreed to conduct a series of joint trials at Davis-Standard's New York facilities, in June and August 2008, that would test Big Vision's ideas for improving its prototype banner.  The parties anticipated that, if the tests were successful, Big Vision would then purchase one or more extrusion machines from Davis-Standard.

25.     In advance of the trials, Big Vision advised Davis-Standard that it was still evaluating different ethylene acrylic resins for use in improving the printability of non-woven PO-based banners.  Davis-Standard suggested that Big Vision consider speaking with DuPont's Packaging & Industrial Polymers ("P&IP") division about a DuPont ethylene acrylic resin called "Entira."

26.     When applied to a substrate, such as wood, metal, or plastic, Entira improves certain qualities of that substrate, such as its adhesion or its scratch-resistance.  On information and belief, the first version of Entira was brought to market in 2006, and since then DuPont's P&IP division had developed and produced a number of different versions of the product, each of which is a unique chemical compound meant for a distinct purpose or use.  "Entira Strong," for example, is an additive that helps improve the stretchiness of tapes, filaments, and films made out of polypropylene and polyester.

27.     In May 2008, DuPont sent Big Vision some technical literature regarding a new type of Entira known as "Entira Coat 100."  On the basis of that information, Big Vision decided to test the addition of Entira Coat 100 to its banner material at the Davis-Standard trials.  On

information and belief, no version of Entira had ever before been used in a banner application, and no one (including DuPont) could predict how the resin might perform on a non-woven PO banner.

### DuPont Observes A Trial Of Big Vision's Innovation

28.     Shortly before the June 2008 trial began, DuPont told Big Vision that it would be willing to provide samples of Entira for Big Vision's tests, subject to two conditions.  First, DuPont wanted to send a small number of P&IP employees to observe the trial.  According to DuPont, the P&IP division saw a potentially large new market for its Entira resin in Big Vision's innovation, so it is was particularly interested in seeing how its product performed.

29.     Second, because the particular types of Entira to be tested by Big Vision had not yet been released to the market, DuPont wanted discussions between the parties to be subject to a non-disclosure agreement.  Given the investment Big Vision had made in the development of its new product, and the enormous value of the related intellectual property, Big Vision agreed that a non-disclosure agreement was critical to the parties' relationship.  Big Vision ultimately agreed to permit DuPont employees to attend the trial, but only on the condition that the parties enter into a non-disclosure agreement.

30.     On May 13, 2008, Davis-Standard relayed to Big Vision DuPont's confirmation that the June 2008 trial must be subject to a non-disclosure agreement.  DuPont reiterated its insistence that "a secrecy agreement be signed with [Big Vision] for the use of there [sic] new [Entira] resin," and that DuPont's "management [be there] for the resin" trial.  Big Vision, in turn, readily agreed to the proposed "secrecy agreement," the precise terms of which would be reduced to writing in due course.

31.     Big Vision thus permitted two DuPont employees, Ms. Seqwana Pryor and Mr. Richard Chou, to attend the June 2008 trial.  Pryor is or was the Global Technology Development Leader and Program Manager of the P&IP division.  Chou is or was a Technology Fellow for the P&IP division.  Both were given access to Big Vision's confidential information and trade secrets.

32.     On the eve of the trial, Pryor and Chou asked Big Vision to share its analysis of the global banner market, its sales projections, and the likely cost structure of its innovation. Pryor and Chou advised that they wanted to better understand how DuPont would fit in as a supplier, and the potential opportunity for their own Entira product.  On the understanding that discussions between the parties were confidential, Big Vision explained to Pryor and Chou the business case for a recyclable banner, the various impediments it had identified to successfully creating one, and the particular relationships with partners that would be necessary to bring a recyclable banner to market.

33.     Big Vision conducted the trial on June 4 and 5, 2008, at Davis-Standard's facility in Fulton, New York.  As it had hoped, Big Vision was able to manufacture fully recyclable, high–quality, non-woven PO banners.  In all, Big Vision tested eight different coating combinations of LDPE, Entira, and other additives.  The resulting banners could display images of a quality comparable to PVC-coated polyester, but would be less expensive to produce because of the lower energy costs associated with PO.  The trial also confirmed that Entira did indeed enhance the printability of Big Vision's banners.

34.     On June 9, 2008, four days after the trial concluded, Big Vision thanked DuPont for its contribution of Entira, and reminded DuPont about the parties' mutual secrecy obligations:

Dear Seqwana / Richard,

First of all would like to thank you all for contribution of the material and being a part of the trial. As discussed in our meeting we request you to kindly send us the copy of the secrecy agreement to be signed immediately and the same can be followed by another agreement with specific details of our product using Entira grade of material which would protect our product and business interest.

Looking forward for your early response.

35.     On the same day, Pryor responded that "[y]our market insight and trends in the printing/banner market are invaluable," and promised to "get back with [you] soon after regarding our local representative and secrecy agreement."  Chou sent an email expressing similar sentiments, noting that "[t]he trial went well," that DuPont "look[ed] forward to working with" Big Vision, and that it was still "working on a secrecy agreement for our collaboration."

## Big Vision And DuPont Sign A Non-Disclosure Agreement

36.     By early July 2008, the parties had reduced their secrecy agreement to writing, in the form of a non-disclosure agreement ("the First NDA") (attached as Exhibit A).  Consistent with each party's stated interest in the relationship – DuPont's as a supplier of ethylene acrylic resin, and Big Vision's as a user of that resin – they explicitly commemorated that the "Purpose" of their arrangement was "to facilitate discussions between the parties concerning a possible business opportunity of mutual interest regarding ethylene copolymers [*i.e.*, acrylic resins] in the manufacturing of film and fabric for printed banners, labels, packaging applications, and other areas where digital printing could be used."

37.     The First NDA specified that neither party was permitted to disclose "Confidential Information" shared by the other "to any third party (including, without limitation, any patent office)."  The First NDA further provided that the parties "shall use [any such] Confidential Information *only* for the Purpose" stated above, which was to develop a "business opportunity of *mutual* interest" (emphases added).

12

38.     The First NDA made clear that any information shared by one party with the other was to be treated as confidential if so designated, unless it fit into certain narrowly defined exceptions.  Those exceptions covered information that (i) became "publicly known through no fault of the receiver"; (ii) was "disclosed to the receiver by a third party who has a lawful right to disclose the information"; (iii) was "already known by the receiver," but only if that prior knowledge could be "shown by its prior written records"; or (iv) was "independently developed by or for the receiver without use of the other party's information."  To eliminate the possibility that either party could circumvent the purpose of the First NDA by an expansive reading of those exceptions, the agreement clarified that

> Information disclosed hereunder shall not be deemed to be within the foregoing exceptions merely because such information is embraced by more general knowledge in the public domain or in the receiver's possession.  In addition, no combination of features shall be deemed to be within the foregoing exceptions merely because individual features are in the public domain or in the receiver's possession, unless the combination itself and its principle of operations are in the public domain or in the receiver's possession.

39.     Moreover, to ensure that neither party used information learned in the relationship to develop a new product without the other's knowledge – that is, to ensure that Big Vision did not replace Entira with a different ethylene acrylic resin, and that DuPont did not develop a banner of its own – the First NDA further obligated the parties to "promptly disclose the results of all tests and experiments" individually conducted by either party and, in particular, any actual "products made therefrom."  The parties also agreed that if they did conduct such individual experiments based on shared information they would "maintain as Confidential Information all information and/or knowledge obtained by [such] inspection or testing."

**DuPont Observes More Trials And The Parties Sign A Second Non-Disclosure Agreement**

40.     In the wake of the success of the first trial, Big Vision made plans for a second trial at the Davis-Standard facilities, to be conducted in August 2008.  The purpose of that trial was to refine the additives applied to Big Vision's coating formulation, and to evaluate the particular non-woven PO fabric that Big Vision intended to use.  That fabric, known as "Claf," was developed by a DuPont competitor called JX Nippon ANCI.

41.     In July 2008, representatives from DuPont's P&IP division introduced Big Vision to a separate DuPont division known as Non-Woven Fabrics ("NOW"), which produces plastic-sheeting products for use in applications such as protective apparel and medical packaging.  The primary purpose of the introduction was to determine whether Big Vision might be interested in using a DuPont-branded non-woven PO-fabric substrate for its banners.  NOW employees introduced Big Vision to three different brands of DuPont non-woven PO-based fabrics that might be substitutes for Claf:  Tyvek, Typar, and Xavan.  Tyvek is a water-resistant, protective membrane made from polyethylene ("PE"), the same material used in Claf.  Typar and Xavan are similar, less-expensive membranes made from polypropylene ("PP").  On information and belief, the NOW division had never before contemplated a recyclable coated-PO banner product made from Tyvek, Typar, or Xavan.

42.     Big Vision agreed to test DuPont's Typar and Xavan fabrics at the August 2008 trial.  It again permitted DuPont to attend its trial, pursuant to the terms of the First NDA.  Among the DuPont employees that attended the second trial were Richard Chou, who had attended the first trial, and Han-Il ("HI") Lee, a Technical and Application Manager for P&IP's Asia-Pacific region.  As was the case during the first trial, DuPont was given access to Big Vision's confidential and trade secret information.

43.     In the aftermath of the 2008 trials, Big Vision and DuPont remained in contact regarding the possible use of P&IP's Entira resin and NOW's Typar and Xavan non-woven fabrics in Big Vision's product.  Among the sensitive information that Big Vision continued to share with DuPont pursuant to the terms of the First NDA were updated economic projections regarding the market opportunity for fully recyclable banners, as well as its model for making the banner-recycling process feasible and economically attractive for customers.  Big Vision also shared the results of the June and August 2008 trials with DuPont, and provided DuPont with samples of the resulting products, again on the understanding that the information was subject to the First NDA.

44.     In June 2009, Big Vision conducted a third trial at Davis-Standard's New York facilities.  Although the primary purpose of this trial was to test an extrusion machine that Big Vision had ordered from Davis-Standard earlier in the year, Big Vision also saw the trial as an opportunity to further refine its formulations, including by testing a new type of Entira that, on information and belief, DuPont now calls "Entira Coat 200."  DuPont was again permitted to attend the trial and sent Richard Chou (for the third time), as well as Rob McPheeters, Head of Marketing for the P&IP division, and Diane Hahm, a Technical Consultant to the P&IP division.  As had been the case on each previous occasion, DuPont gave Big Vision every reason to believe that, per the parties' contractual agreement, DuPont's attendance at the trial was to further the parties' common interest.

45.     In July 2009, Big Vision and NOW executed their own non-disclosure agreement ("the Second NDA") (attached as Exhibit B).  Whereas the First NDA reflected only the parties' narrow interest in DuPont's ethylene acrylic resins, the "purpose" described in the Second NDA was broader: "[T]o facilitate discussions between the parties concerning a possible business

opportunity of mutual interest regarding graphic products, and markets/manufacturing processes therefore." The Second NDA was otherwise identical to the first in all material respects.

## DUPONT BREACHES THE AGREEMENTS

46.     Notwithstanding its contractual obligation to work toward a "business opportunity of mutual interest," DuPont instead used what it learned at Big Vision's trials to create its own recyclable banner material that would compete directly with Big Vision.

47.     On information and belief, prior to being invited to Big Vision's June 2008 trial, DuPont lacked the knowledge and expertise to develop or take to market a recyclable banner. Thus, although it accepted the invitation to join Big Vision's trials under the pretext of being a supplier, it used the trials to co-opt the confidential ideas and trade secrets of a company it deemed a potential competitor.

## DuPont Patents Big Vision's Innovation As Its Own

48.     Having gained access to Big Vision's intellectual property and trade secrets through its contractual agreement to comply with strict confidentiality requirements, on November 26, 2008, DuPont filed a provisional patent application with the United States Patent & Trademark Office that contained the very information it had learned from Big Vision.

49.     In its Provisional Application 61/118,129 (attached as Exhibit C), which is entitled "Recyclable Coated Banner Substrate," DuPont claims to have invented a process that "relates to banners comprising materials suitable for recycling." The Provisional Application begins by describing the central insight that underlies the invention, which DuPont learned from Big Vision at the Davis-Standard trials:

> It is desirable to make coated banner substrates that are recyclable so that they do not add to the solid waste problem. Unfortunately, polyvinylchloride [PVC] is difficult to recycle . . . . What is needed is a coated banner substrate that is suitable for recycling where the coating and the banner substrate are chemically compatible. This type of banner could be

recycled via a simple process of grinding the banner into chips and . . . processing [the chips] into new products.

50.    DuPont's Provisional Application then proceeds to describe the precise technical innovation that Big Vision demonstrated to DuPont at the Davis-Standard facilities:   A "[r]ecyclable coated banner," in which layers of ethylene acrylic resin are affixed, via "extrusion coat[ing]," to "a planar polyolefin banner substrate."   As an example of the invention, the Provisional Application describes a banner made in exactly the same way, and using the exact same additives, that Big Vision tested at the Davis-Standard facilities.   The Provisional Application makes clear that, since the polyolefin-fabric substrate and coating "are chemically similar, they can easily be recycled."

51.    Despite incorporating a number of innovations developed either by Big Vision or through the parties' collaboration at the Davis-Standard trials, the Provisional Application identifies as the inventor of the claimed invention only Eric W. Teather of Elkton, MD, who, on information and belief, was an employee of DuPont.

52.    Big Vision was not aware of the Provisional Application when it conducted its third trial in June 2009, nor when it signed the Second NDA with DuPont in July 2009, and no one at DuPont ever mentioned its existence to Big Vision.

53.    On November 24, 2009, DuPont formally filed a patent application, No. 12/624,684, for the invention described in its earlier Provisional Application.  The inventors listed were not only Mr. Teather, but also Seqwana Pryor and Richard Chou, two DuPont employees who had observed Big Vision's trials under the terms of the First NDA.

54.    On November 25, 2009, pursuant to the Patent Cooperation Treaty, DuPont also applied for an international patent, Application No. PCT/US09/65880 (attached as Exhibit D),

over the same invention described in its U.S. patent application.  That application was published

on June 3, 2010 as Publication No. WO/2010/062939.

55.    On May 26, 2011, DuPont's U.S. patent application was published as No.

2011/0123782 (attached as Exhibit E).  The listed inventors have assigned the patent to DuPont.

The patent has not yet issued.

### DuPont Uses Big Vision's Innovation To Create And Sell Its Own Products

56.    In addition to patenting Big Vision's inventions and trade secrets as its own,

DuPont also took Big Vision's innovation to market.  On April 9, 2009, DuPont introduced a

new product known as "Tyvek Vivia."  According to DuPont's press release, "DuPont Tyvek

Vivia is a recyclable solution that is excellent for printing graphics, resists creases for a more

polished look and offers superior durability for indoor and outdoor banner and sign

applications."  On information and belief, Tyvek Vivia is a coated, PO-based non-woven fabric.

In form, function, and design, it is virtually identical to the product developed by Big Vision and

shared with DuPont at the Davis-Standard facilities.  Based on statements made by DuPont

representatives at the June and August 2008 trials, DuPont was not capable of creating and

taking to market this product without use of Big Vision's confidential and trade secret

information.

57.    On information and belief, DuPont could not have developed Tyvek Vivia

without conducting its own test or experiments that made use of information learned from Big

Vision's trials.  DuPont never disclosed its individual research, as required under the First NDA.

58.    Big Vision was not aware that DuPont was marketing a non-woven, recyclable

PO banner when it permitted DuPont to attend its June 2009 trial, nor when it signed the Second

NDA.  DuPont also never told Big Vision that it was marketing a product that would compete

directly with the one being developed by Big Vision. Had Big Vision been aware of this product it never would have invited DuPont to its third trial or shared the results of that trial.

59. A year later, in September 2010, DuPont introduced "Imvelo" and "Imvelo Deco," two additional recyclable banner products for large format, outdoor applications. On information and belief, Imvelo and Imvelo Deco, like Tyvek Vivia, are PO-based non-woven fabrics coated with LDPE, Entira, and other additives. Both are somewhat lower quality, less expensive versions of Tyvek Vivia, created by downgauging the coating on the non-woven PO fabric. Upon information and belief, DuPont learned about downgauging from Big Vision and used this process in violation of the First and Second NDAs.

60. DuPont now sells Tyvek Vivia, Imvelo, and Imvelo Deco around the world, including in markets about which Big Vision provided detailed information that was previously unknown to DuPont.

61. DuPont also shared Big Vision's confidential ideas and trade secrets with third parties. To make the recycling process easier for potential customers, DuPont partnered with Waste Management, Inc. to create a national mail-in recycling program. This program, and the recycling process it follows, is based upon confidential information Big Vision shared with DuPont. Big Vision was not aware of DuPont's relationship with Waste Management when it permitted DuPont to attend the June 2009 trial or when it signed the Second NDA, and DuPont never told Big Vision about the recycling program.

62. On information and belief, DuPont also shared Big Vision's confidential ideas and trade secrets with other third parties that are part of the production chains for Tyvek Vivia, Imvelo, and Imvelo Deco, among them companies around the world that coat and manufacture banner products for DuPont. Some of these partners are known competitors of Big Vision.

**Big Vision Demands An Explanation, Which DuPont Refuses To Provide**

63.     Even as DuPont was engaging in the activities described above, it continued to represent to Big Vision that it was honoring the terms of the First and Second NDAs.  Finally, in late September 2009, Big Vision discovered on its own that DuPont had launched Tyvek Vivia as a recyclable banner product that was developed using Big Vision's confidential and trade secret information, in breach of the parties' two NDAs.

64.     On October 6, 2009, Big Vision wrote to DuPont, demanding an explanation for DuPont's activities.  It never received one.  In November 2010, Big Vision advised DuPont that, unless DuPont ceased its wrongful conduct and redressed Big Vision's claims, Big Vision would bring suit.  DuPont's wrongful conduct nevertheless proceeds unabated.

## COUNT ONE
### (Breach Of Contract)

65.     Plaintiff incorporates by reference the preceding paragraphs as if set forth herein.

66.     Big Vision and DuPont entered into two contracts, memorialized in the First and Second NDAs, which governed the use by each party of certain Confidential Information shared by the other.  The contracts explicitly restrict the use of such Confidential Information to a "business opportunity of mutual interest," and provide that the receiver of such Confidential Information "shall not disclose the Confidential Information to any third party (including, without limitation, any patent office)."  The contracts also require each party to "promptly disclose the results of all tests and experiments" individually conducted by either party and, in particular, any actual "products made therefrom."

67.     Pursuant to the two contracts, Big Vision shared valuable, confidential information with DuPont, including how to develop a high-quality, cost-effective recyclable banner material; financial information concerning the market for such a product and price points

necessary to make the product profitable; and a business process for enabling the cost-effective recycling of the product.

68.     Having received that information, and having pledged to abide by the terms of the two contracts, Defendant nevertheless used that information for its own benefit in material breach of the contracts by, among other things, applying for a patent covering Plaintiff's information, conducting research based upon Plaintiff's confidential information without disclosing the existence or results of that research to Big Vision, developing products based on Plaintiff's information that compete directly with Plaintiff itself, and sharing Plaintiff's information with various third parties that also compete with Plaintiff.

69.     As a direct and proximate result of Defendant's breaches, Plaintiff has sustained significant economic injury including, among other things, lost sales, lost licensing fees, and lost business opportunities.

## COUNT TWO
### (Unfair Competition)

70.     Plaintiff incorporates by reference the preceding paragraphs as if set forth herein.

71.     As previously described, the parties entered into a confidential relationship, the purpose of which was to evaluate a "possible business opportunity of mutual interest."

72.     In the course of that relationship Defendant gained access to Plaintiff's confidential business ideas, technical designs, market data, and business models.  Each of these is a trade secret that Plaintiff developed at considerable effort and expense.  Plaintiff reasonably expected it would be able to use the confidential information it had developed to enter into profitable business relationships selling its recyclable banner product and thereby capture a significant share of the market it had identified.

73.     Acting in bad faith, Defendant misused the information obtained from Plaintiff to, among other things, apply for a patent, develop and sell products (including Tyvek Vivia, Imvelo, and Imvelo Deco), and form relationships with third parties, all of which were to Plaintiff's detriment.   Defendant's misuse of this information wrongfully interfered with Plaintiff's ability to enter into relationships with prospective customers of its banner product.

74.     As a direct and proximate result of Defendant's tortious conduct, Plaintiff has sustained significant economic injury including, among other things, lost sales, lost licensing fees, and lost business opportunities.

75.     Defendant's conduct giving rise to this claim was gross, wanton and egregious.

## COUNT THREE
### (Misappropriation Of Trade Secrets)

76.     Plaintiff incorporates by reference the preceding paragraphs as if set forth herein.

77.     As previously described, the parties entered into a confidential relationship, the purpose of which was to evaluate a "possible business opportunity of mutual interest."

78.     In the course of that relationship Defendant gained access to a number of Plaintiff's trade secrets, including but not limited to its technical designs for a recyclable banner material and the methods and materials necessary to place a high-quality image on that material; proprietary market research concerning the size and drivers of the international market for banners, including detailed cost and margin projections; and designs and models for implementing a feasible and viable "recycle loop" for collecting and reprocessing used banners.

79.     The material to which Defendant gained access was not known outside of Plaintiff's business and, indeed, was known to only a few members of that business; was not shared with others unless a confidentiality or non-disclosure agreement existed; was central to developing a high-quality, cost-effective product; was developed at considerable expense to

Plaintiff over many years; and could not easily be duplicated without the expensive research and testing that brought the parties together in the first place.

80.     In violation of both the contracts between the parties and the confidential relationship between them, Defendant used Plaintiff's trade secrets to, among other things, apply for a patent, develop and sell a product, and form relationships with third-parties, all of which were to Plaintiff's detriment.

81.     As a direct and proximate result of Defendant's tortious conduct, Plaintiff has sustained significant economic injury including, among other things, lost sales, lost licensing fees, and lost business opportunities.

82.     Defendant's conduct giving rise to this claim was gross, wanton and egregious.

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

(a)     for a declaration that Defendant breached the First and Second NDAs, and engages in unfair competition and other violations of New York law;

(b)     for preliminary and permanent injunctive relief that bars Defendant from violating Plaintiff's rights, including but not limited to marketing Tyvek Vivia, Imvelo, Imvelo Deco, and any other products, including banner coatings, that are based upon Plaintiff's confidential and trade secret information;

(c)     for compensatory damages for Defendant's breaches and other violations, in amounts to be proven at trial;

(d)     for punitive damages based upon Defendant's gross, wanton and egregious conduct;

(e)     for prejudgment and post-judgment interest; and

(f)     for such other relief as the Court may deem just and proper.

Respectfully submitted,

Gary A. Orseck
Lawrence S. Robbins (LR-8917)
Kathryn S. Zecca
Ariel Lavinbuk
Leif Overvold
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411
Washington, DC 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
lrobbins@robbinsrussell.com

Dated: November 23, 2011                    *Counsel for Plaintiff*

24