UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  March 3, 2014

------------------------------------------------------------ X
                                   :

BIG VISION PRIVATE LTD.,            :
                                   :

                 Plaintiff,     :       11 Civ. 8511 (KPF)
                                   :

          -v.-             :      OPINION AND ORDER
                                   :

E.I. DUPONT DE NEMOURS & CO.,    :
                                   :

                 Defendant.   :
                                   :

------------------------------------------------------------ X

KATHERINE POLK FAILLA, District Judge:

      On November 23, 2011, Plaintiff Big Vision Private Limited ("Big Vision" or "Plaintiff") initiated the instant action against Defendant E.I. DuPont De Nemours & Co. ("DuPont" or "Defendant"), alleging breach of contract, unfair competition, and misappropriation of trade secrets. Broadly speaking, Big Vision claims that (i) DuPont misappropriated its five-element trade secret method for producing recyclable banners over the course of three laboratory trials attended by both Big Vision and DuPont in 2008 and 2009, and (ii) its trade secret is reflected in several DuPont patent applications and in certain recyclable banner products that DuPont introduced to the market between 2009 and 2011. Pending before the Court is DuPont's motion for summary judgment. For the reasons set forth in the remainder of this Opinion, the motion is granted.

# BACKGROUND[1]

## A.    Factual Background

## 1.    The Parties and the Claims

Plaintiff Big Vision is a digital printing company with approximately 50

employees, headquartered in Mumbai, India.  (Compl. ¶ 6; S. Visaria Tr. 10).[2]

---

[1]    Mention must be made of the substantial record before the Court.  The parties' submissions reveal a herculean discovery effort.  As but a few examples, the parties have submitted two separate 56.1 statements, two 56.1 counterstatements (resulting in 223 paragraphs of fact, nearly 200 of which were contested to some extent), 227 exhibits, and thousands of pages of deposition transcripts.  Plaintiff's counsel, in particular, has done an impressive job of disputing nearly every issue of fact.  Indeed, one could be forgiven for assuming that each dispute identified was, in fact, material.  Precisely for this reason, the Court followed Plaintiff down each and every rabbit hole created by its disputed issues of fact, and determined — after considerable effort — that, for the reasons discussed throughout this Opinion, there simply are no material issues of fact precluding summary judgment in favor of DuPont.

Plaintiff weaves a compelling tale in its Complaint and opposition papers, one which the Court followed closely, but which ultimately did not withstand scrutiny.  Here, too, a few examples bear out the point: Plaintiff asserts that there were no "cost-competitive" recyclable banners on the market in 2007, yet neglects to provide pricing information for any of the 11 recyclable banners then on the market.  *See* n.6, *infra.*  Big Vision also claims that it was the first to "successfully downgauge Entira with LDPE for the purposes of a recyclable banner application" (Pl. Opp. 4), yet omits mention of the considerable input it received from third parties, ignores evidence that DuPont had done so previously, and overlooks the very real possibility that it may have been the first only because Entira was not yet on the market, *see* Discussion Sec. 5(a)).  Big Vision alleges that DuPont gained entry to certain laboratory trials by disingenuously representing itself as a "mere resin supplier," yet ignores the critical fact that DuPont was invited to participate in these trials, and concedes the absence of record support of any such ulterior motive *ab initio.*  (Pl. Opp. 5; Transcript of November 5, 2013 Oral Argument ("Nov. 5 Tr.") at 36).  Lastly, Plaintiff alleges that its putative trade secret is worth tens of millions of dollars, but glosses over its failure to date to manufacture commercially or even sell a single recyclable banner.  (Pl. Opp. 21 n.14; Shailesh Visaria Deposition Transcript at 79).

[2]    The facts stated herein are drawn from the parties' submissions in connection with the instant motion.  These include Defendant's Local Rule 56.1 Statement of Material Facts ("Def. 56.1"); Plaintiffs Local Rule 56.1 Statement of Material Facts ("Pl. 56.1"); Plaintiff's Local Rule 56.1 Statement in Reply ("Pl. 56.1 Response"); and Defendant's Local Rule 56.1 Statement in Reply ("Def. 56.1 Response"), all of which were filed under seal, and then refiled in redacted form pursuant to the Court's instructions.  Citations to a party's 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the

Big Vision has over 15 years' experience printing advertising banners and billboards.  (Compl. ¶¶ 1, 6; Pl. 56.1 ¶ 139).

Defendant DuPont is a Delaware corporation headquartered in Wilmington, Delaware.  (Def. 56.1 ¶ 1).  DuPont's Tyvek® is a recyclable, nonwoven substrate made from polyethylene that has been used for over 20 years as an advertising banner.  (*Id.* at ¶ 52).  Coated, recyclable Tyvek products have been developed and sold for at least 10 years by several companies.  (*Id.* at ¶ 53).  DuPont also produces and sells specialty polymers and resins, such as Entira®, and commodity pigments such as titanium dioxide ("$TiO_2$").  (*Id.* at ¶ 2).[3]

Big Vision alleges that DuPont misappropriated its five-element trade secret for producing recyclable banners, which it defines in its briefing as: (i) a "suitably strong nonwoven polyolefin central layer"; (ii) "high pigment levels, including $CaCO_3$"; (iii) "a layered structure efficiently made by coextrusion or

---

moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent … controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Exhibits 1 to 78 are attached to the July 16, 2013 Declaration of Anna R. Mercado; Exhibits 79 to 206 are attached to the August 15, 2013 Declaration of Leif Overvold; Exhibits 207 and 208 are attached to the August 16, 2013 Declaration of Leif Overvold; and Exhibits 209 to 227 are attached to the August 30, 2013 Declaration of Anna R. Mercado.  References to "[Name] Decl." reflect citations to the declaration of the named party, while references to "[Name] Tr." reflect citations to the deposition transcript of the named party.

[3]   Many of the technical terms mentioned in this subsection are discussed in detail in the remainder of the Factual Background.  For convenience, all references to Entira, EntiraCoat, EntiraCoat 100, and Tyvek in the remainder of this Opinion are presumed to include the registered mark symbol.

lamination of a predominantly LDPE structure"; (iv) "minimal use of Entira or other expensive resins"; and (v) "surface treatment." (Pl. 56.1 ¶ 159; Pl. Opp. 23-24). Related to this claim is a claim for breach of contract, which Big Vision predicates on two non-disclosure agreements between the parties, and a claim for unfair competition. A careful review of the record — set forth herein with particular focus on the disclosures made by, and the agreements reached between, the parties — is essential to understanding the arguments now made to this Court.

### 2.    Banner Production Generally

Banners are commonly produced by "extruding," or coating, polyvinyl chloride ("PVC"), a polymer, onto the surface of a base, or "substrate," which is usually a lightweight, woven fabric, such as polyester. (Def. 56.1 ¶¶ 5, 6). PVC banners are not recyclable. (*Id.* at ¶ 8; Compl. ¶ 12). Substrates can also be made of polyethylene ("PE") or polypropylene ("PP"), both of which are of the class of polymers known as polyolefins, and both of which can, in certain circumstances, be recyclable. (Benim Decl. ¶ 9; S. Visaria Tr. 87-88).

Extrusion coating equipment coats the substrate one layer at a time, while coextrusion coating equipment coats the substrate with two or more layers simultaneously. (Def. 56.1 ¶ 10). The layers of the banner are referred to as the banner's "structure," and are commonly referred to with letter designations, as, for example, "A/B/A" or "A/B." (Ronaghan Tr. 10-11).

The "masterbatch" is a customizable commercial blend of one or more additives in various concentrations that can be extruded onto the substrate.

(Def. 56.1 ¶ 6).  Various other materials, including resins and additives, can be added to the masterbatch or extruded separately to confer certain physical qualities onto the banner, such as opacity or a silky finish.  (*Id.*).

Materials to be coated can include expensive, specialty resins like DuPont's Entira, and inexpensive, commodity resins like Low Density Polyethylene ("LDPE").  (Def. 56.1 ¶¶ 7, 57).  LDPE is a widely-used and cost-effective extrusion coating resin.  (*Id.* at ¶ 85; Ex. 6 at 5 (Defendant's expert noting that LDPE is "widely known to be the least expensive and easiest to process resin for extrusion coating"); Reitman Tr. 216; Shokar Tr. 19-20 (noting that LDPE was the "most widely-used and cost-effective extrusion coating resin")).  Other ingredients may include titanium dioxide ($TiO_2$), one of the most-commonly used whitening elements worldwide.  (Ex. 6 at 15 (noting that $TiO_2$ is "the best of the opacifiers").  Calcium carbonate ($CaCO_3$) is also frequently used to improve printability in the top layer of the banner, or as a filler or whitening agent.  (*Id.* at 14).

### 3.   Big Vision Explores the Recyclable Banner Market

### a.   The Decision to Develop Recyclable Banners

In early 2007, perceiving a need in the market, Big Vision began exploring a project to develop cost-competitive recyclable banners for its own use and for resale.  (Pl. 56.1 ¶¶ 140-41).  In or around April 2007, Big Vision retained a polymer expert with experience in product development, Dr. Yatish Vasudeo, to assist in developing a recyclable banner.  (*Id.* at ¶ 144).  Big Vision then entered into a written confidentiality agreement with Dr. Vasudeo that,

*inter alia*, prevented him from disclosing Big Vision's "business and manufacturing secrets." (*Id.* at ¶ 148; Ex. 150).

### b.   Circulation of the Circle Graphics Article and Subsequent Patent Searches

In April 2007, Manish Avashia, the executive director of Big Vision, circulated an article to the company's managing director, Shailesh Visaria ("Visaria"), and to Dr. Vasudeo from "Sign of the Times," a U.S.-based trade publication. (Def. 56.1 ¶ 86; Pl. 56.1 ¶ 139; Avashia Tr. 8; Ex. 44). The article concerned a recyclable banner patent recently filed by Circle Graphics, a Denver-based printing company (the "Circle Graphics Patent"). (Ex. 44).[4] Shortly thereafter, Visaria began conducting patent searches on the Internet, in the course of which he found and reviewed a number of patents related to recyclable banners, including ones filed by Circle Graphics and 3M (the "3M

---

[4]   Circle Graphics developed a coated, recyclable banner prior to April 2007. (Def. 56.1 ¶ 88; Def. 56.1 Response ¶ 143; Ex. 30). The Circle Graphics Patent, published in 2007, disclosed (i) "virtually any strong, flexible, sheet like material," such as polyolefin or the polypropylene TYPAR, including woven and nonwoven core layers [paras. 0011-0014, 0049, 0050]; (ii) "[v]arious additives to improve suitability for various applications," including $TiO_2$ and $CaCO_3$ to enhance printability with solvent-based inks [paras. 0047, 0057]; (iii) casting, molding, extrusion, film blowing, or similar methods [paras. 0046, 0048]; (iv) "[c]orona treatment or other treatment to increase its surface energy" [paras. 0029, 0048]; and (v) a top layer of the "minimum thickness required," between 0.4 and 2 mils [para. 0046], "with an acrylic coating receptive to solvent-based inks" [para. 0048]. (Ex. 30).

Plaintiff's expert states conclusorily that the Circle Graphics Patent does not disclose "that the LDPE compositions or LDPE layers in a coextruded structure can provide a printable surface for solvent-based inks." (Ex. 11 at 6-7). Defendant's expert disagrees, noting that the Circle Graphics Patent discloses repeatedly that it is printable with solvent-based inks [paras. 007, 0022, 0023, 0028, 0029, 0036, 0039, and 0054]; that the structure can be made through coextrusion [paras. 0027, 0051]; that the top layer should be made of polyethylene, which "provides a smooth, print receptive surface when coated" [paras. 0011, 0046]; and that because "the core layer is made from a material with a similar composition to the top layer, for example a polyolefin, this will facilitate recycling of the entire substrate" [para. 0049]. (Ex. 6 at 8-9).

Patent").[5]  (S. Visaria Tr. 131-32, 174-76).[6]  Visaria also obtained a recyclable

banner sample from InterWrap shortly thereafter.  (S. Visaria Tr. 107, 150).[7]

---

[5]     The 3M Patent, published in 2004, disclosed (i) an image-receptive layer compatible
with solvent-based inkjet inks, with a thickness of between 0.5 and 2 mils, which layer
includes a carrier resin comprised of a modified polyolefin and an ink-absorptive
specialty resin (including DuPont's Elvaloy or Fusabond) compatible with the carrier
resin [col. 2-4]; (ii) extrusion and coextrusion [col. 3]; (iii) multilayer structures that
include LDPE and polypropylene [col. 14, 16, 17]; and (iv) the use of $TiO_2$ and $CaCO_3$ in
the print-receptive layer, in concentrations up to 25% [col. 5].  (Def. 56.1 ¶ 92; Ex. 31).

Plaintiff's expert argues without more that the 3M Patent does not disclose "LDPE
compositions, or the use of LDPE layers in a co-extruded structure for downgauging."
(Ex. 11 at 6).  Defendant's expert again disagrees, noting that the 3M Patent does
disclose a number of extruded or coextruded structures that include LDPE, LLDPE
(Linear Low Density Polyethylene), and polypropylene.  (Ex. 6 at 10 (citing tables 4, 6)).
The Court notes that the 3M Patent plainly and repeatedly discloses the use of LDPE.

[6]     Big Vision alleges that as of early 2007, no other company had successfully developed a
"cost-competitive" recyclable banner (Pl. 56.1 ¶ 143), a point which DuPont disputes (Pl.
56.1 Response ¶ 63; Def. 56.1 Response ¶ 143).  Because neither party has offered
evidence regarding the prices of the banner products discussed herein, it is impossible
for the Court to evaluate Plaintiff's assertion.  The Court notes, however, that a
representative of the Canadian manufacturer InterWrap testified that, in 2007, that
company was offering a cost-competitive recyclable banner line known as ECOS.
(Shokar Tr. 15).

More fundamentally, Big Vision's attempts to denigrate the state of the art in the
recyclable banner industry as of early 2007 are bedeviled by the absence of record
support for the company's subjective assertions.  Big Vision alleges, for instance, that
the "printability" and "aesthetics" of then-existing recyclable banners were "below
acceptable levels," but its expert conceded that there are no objective, industry-
standard tests for either characteristic.  (Def. 56.1 Response ¶ 146).  Furthermore, in
this regard, the expert served more as conduit than as aid; her opinion was based upon
assertions made by Shailesh Visaria, the managing director of Big Vision, about the
quality of other companies' banners, and not on the expert's own review of the
approximately 11 recyclable banner products that were commercially available during
that period.  (*See* Ex. 11 at 5 ("*As reported by Big Vision at the time*, printability and
aesthetics were below desired levels." (emphasis added)); Ex. 6 at 7 (Defendant's expert
observing that Plaintiff's expert "acknowledges that at least 11 other recyclable banner
products were available in the market," but that "it does not appear that [the expert]
inspected or analyzed these products, other than the InterWrap ECOS product," and
further noting that "the supposed 'limitations' of these products which [the expert]
refers to were taken from a chart prepared by DuPont" (citations omitted))).  As
Defendant's expert notes and Plaintiff does not dispute, at least one arbiter of
acceptability is commercialization, and the fact that these products were commercially
available indicated, at least in part, that they were acceptable to the market.  (Ex. 6 at
7).

[7]     InterWrap developed a recyclable banner around 2005.  (Shokar Tr. 11-13).  The
components of that banner were (i) a woven, polyethylene substrate, (ii) that was
extrusion coated, (iii) with a structure "largely" comprised of LDPE, $CaCO_3$, a
"significant amount" of $TiO_2$, and (iv) UV additive.  (Shokar Tr. 12-13).

### c.   Big Vision Produces a Test Film at Charu Plastics

As part of its recyclable banner development project, in April 2007, Big Vision contacted Charu Plastics in Indore, India, and asked them to produce a blown, white, opaque film with $CaCO_3$, $TiO_2$, and corona treatment.  (Pl. 56.1 ¶¶ 145-46; S. Visaria Tr. 120, 122; Ex. 29).  In his initial e-mail communication with Charu Plastics, Visaria attached a copy of the "Sign of the Times" article regarding Circle Graphics' patent for recyclable banners. (Ex. 29).

Around June 2007, Charu Plastics produced a blown film for Big Vision that included $CaCO_3$, $TiO_2$, LDPE, and corona treatment.  (Pl. 56.1 ¶ 145; S. Visaria Tr. 122).  Shailesh Visaria and Urmil Visaria ("Urmil"), the manager of marketing at Big Vision and Shailesh's nephew, provided different accounts of how the film came to be produced.  (U. Visaria Tr. 14, 18).  Urmil testified that his uncle instructed him to give Charu Plastics a pre-mixed blend of $TiO_2$, $CaCO_3$, and LDPE, and that Charu Plastics later added in LLDPE.  (*Id.* at 57-58).

Visaria testified, by contrast, that "[w]e asked [Charu Plastics] for [a] white opaque film with calcium carbonate and $TiO_2$ with corona treatment," but did not specify the amount of $TiO_2$ or $CaCO_3$ to use.  (S. Visaria Tr. 122-

---

In 2007, InterWrap introduced its ECOS line, which comprised two similarly constructed recyclable banners: a heavier-weight banner known as Posterflex, and a lighter, less-expensive banner known as Flexilite.  (Shokar Tr. 14-15).  The components of the ECOS line of products were (i) a woven polyethylene substrate, (ii) that was extrusion coated on both sides with (iii) an LDPE-$TiO_2$ mix, $TiO_2$, and (iv) a UV additive. (*Id.* at 15-16).  InterWrap selected LDPE because it was (and is) the most widely-used and cost-effective extrusion-coating resin.  (*Id.* at 19-20).  Plaintiff's expert conceded that the pigment levels in this product "tend toward the higher end."  (Def. 56.1 ¶ 64).

23).[8]  Visaria further testified that Big Vision did not know the precise amounts

of ingredients used in the film, since Big Vision did not send the final product

out for analysis.  (*Id.* at 122-23).  While Big Vision concededly did not enter into

a written non-disclosure agreement with Charu Plastics, Visaria testified that

Big Vision "didn't tell [Charu Plastics] what the intentions of the film" were and

"didn't give them any [of the] structure[s]."  (*Id.* at 121-22).

> ### d.      Big Vision Seeks a Manufacturer

Big Vision began contacting manufacturers in 2007 and 2008 with the

intention of purchasing its own machinery to manufacture recyclable banners.

(Pl. 56.1 ¶ 147).  In early 2007, Big Vision contacted various manufacturers

and disclosed the "recipe" from the 3M Patent as its intended formulation.

(Ex. 63, 64, 65; S. Visaria Tr. 188-92, 194).[9]  That formulation included the

specific percentages of the ingredients for, and structure of, each layer.  (*See*

---

[8]      It is worth noting here that these same elements are disclosed in combination by the Circle Graphics Patent: "[v]arious additives to improve suitability for various applications," including $TiO_2$ and $CaCO_3$; film blowing, or similar methods; "[c]orona treatment or other treatment"; and polyethylene.  (*See* n.4, *supra*; Ex. 30).

Visaria testified at his deposition that Big Vision was not concerned that it might be infringing upon the Circle Graphics Patent, because Big Vision subsequently used a nonwoven substrate.  (S. Visaria Tr. 168-69, 173).  In response to a question noting that the Circle Graphics Patent in fact disclosed the use of a nonwoven substrate, Visaria repeated, without more, that Big Vision simply did not believe it was infringing upon the Circle Graphics Patent.  (*Id.* at 169, 173).

[9]      Visaria testified that Big Vision was also not concerned about infringing upon the 3M Patent because that patent "was just a film patent." (S. Visaria Tr. 176).  Regardless, the 3M Patent played a recurrent role in Big Vision's recyclable banner project, at least from 2007 to 2008.  Not only did Visaria admit to having reviewed the patent "in detail" (*id.* at 175), but he also admitted to having discussed this patent with DuPont and with a New Jersey-based company, Davis-Standard, because Big Vision "would [have] require[d] something like [the 3M Patent] to have a top coat for ink-receptive coating" (*id.* at 175-80).

Ex. 63, 65).[10]  Big Vision did not enter into confidentiality agreements with these manufacturers, but Visaria testified that he had an "understanding of confidentiality" or an "understanding of confidentiality orally" with them.  (S. Visaria Tr. 188, 191-93).

Big Vision then turned to Davis-Standard, a noted manufacturer of extrusion and coextrusion equipment.  (Def. 56.1 ¶ 13).  In May 2007, Shailesh Visaria met Philip Tan, a sales representative from Davis-Standard.  (S. Visaria Tr. 145-46).  Visaria testified that he told Tan that Big Vision "wanted to manufacture a polyethylene film," and may have discussed the Circle Graphics Patent with Tan.  (*Id.* at 145-47).  In April 2008, Big Vision entered into a contract with Davis-Standard for the production of an extrusion coating line.  (Ex. 32).  Visaria testified that he and three employees of Davis-Standard exchanged "verbal [] terms of confidentiality," but conceded that they did not enter into a written confidentiality agreement.  (S. Visaria Tr. 219-21).  Christine Ronaghan, the sole Davis-Standard witness deposed in this case, testified that to her knowledge, Big Vision and Davis-Standard did not enter into a confidentiality agreement.  (Ronaghan Tr. 50).

### 4.    DuPont's Pre-2008 Recyclable Banner Development

DuPont was another company involved in the recyclable banner market; of note, at least two different DuPont divisions in North America had explored recyclable banners before being introduced to Big Vision.  By way of

---

[10]    Plaintiff admits that what it disclosed to at least some of these manufacturers was "a film with a structure that was completely different from those run by Big Vision in the trials at Davis-Standard."  (Pl. 56.1 Response ¶ 115).

background, DuPont's previous coated-fabric development efforts, including

banners, are reflected in a variety of patent applications.  (*See* Def. 56.1 ¶¶ 66-

68, 70-72).[11]  In 2002, Dr. Richard Chou, a chemist in DuPont's Polymers and

Industrial Products division ("P&IP"), began development of a copolymer known

as E/MAME.  (Chou Tr. 12, 20).  In or around 2006, E/MAME became, to

borrow from DuPont's terminology, a "platform" that included a number of

related products, including Fusabond 603M and Entira.  (*Id.* at 20, 22).  Entira,

in particular, is an ethylene copolymer resin that blends two of DuPont's

proprietary resins, [redacted] and [redacted].  (*Id.* at 23; Def. 56.1 ¶ 19).

Beginning around 2006, Dr. Chou and H.I. Lee, a P&IP chemist with

extensive experience developing specialty polymers and resins, explored using

Entira in various coated-fabric applications, including recyclable banners and

projection screens.  (Chou Tr. 41-42, 81; Lee Tr. 22).  As part of these

explorations, Lee and others within DuPont ran a series of tests between 2006

---

[11]     DuPont has identified at least six relevant patents, all of which DuPont applied for or
obtained prior to its introduction to Big Vision.  The relevant patents include: (i) a
March 4, 2008 provisional patent application filed by Eric Teather, which disclosed a
recyclable Tyvek substrate with an extruded layer of LDPE along with other polymers
and polymer blends, including $TiO_2$ and $CaCO_3$ from 1-10% for use in projection screens
(Def. 56.1 ¶ 66; Ex. 6 at 10-11); (ii) an October 25, 2007 patent application, which
disclosed the use of $TiO_2$ and $CaCO_3$ from 0.1 to 50% for use in a polyolefin layer in a
banner application, and surface treatments of any form known within the art (Def. 56.1
¶ 67; Ex. 6 at 11); (iii) a July 13, 2006 patent application, which disclosed a printable,
multilayer advertising banner comprising a woven or nonwoven substrate, the use of
specialty resins such as Elvaloy AC pigmented with $TiO_2$ for whiteness and opacity,
along with $TiO_2$ and $CaCO_3$ in other layers of the banner, in an extrusion- or
coextrusion-coated structure (Def. 56.1 ¶ 68; Ex. 6 at 11); (iv) a May 6, 1997 patent,
which disclosed LDPE as the sole extrusion-coated layer on a nonwoven polyethylene or
polypropylene fabric for use as a protective garment (Def. 56.1 ¶ 70; Ex. 6 at 11); (v) a
July 17, 1990 patent, which disclosed a nonwoven, Tyvek substrate coated with an
outer polyethylene layer for printing applications (Def. 56.1 ¶ 71; Ex. 6 at 11); and (vi) a
March 6, 1990 patent, which disclosed a nonwoven polyolefin banner coated with a
polymer coating that "makes the surface receptive to printing inks" and can contain
58% $TiO_2$ (Def. 56.1 ¶ 72; Ex. 6 at 11).

and 2008 using specialty resins, including a precursor to Entira, and LDPE, as well as using LDPE alone, on various substrates.  (Def. 56.1 ¶ 58).[12]  Lee was also working at that time to develop recyclable advertising banners using [redacted] for several customers in Asia.  (Lee Tr. 30-31).

"Downgauging" is an extremely common technique in the extrusion coating industry; it simply means to use less of a material, usually in order to reduce costs.  (Lee Tr. 136).  In fact, Lee testified that when he entered the packaging industry in 1980, the first term he learned was "downgauging."  (*Id.*).  Perhaps because it was so common, Lee testified that when he develops or tests any resin, he always tries downgauging that resin in laboratory trials to determine the minimal possible thickness at which it still functions.  (*Id.* at 137, 144-45).  Thus, his normal laboratory procedure is to first try to extrude 100% of the expensive resin, and then "split [the resin] using LDPE" in a two- or three-layer structure in order to "reduce the material cost."  (*Id.* at 181).

A separate DuPont division, known as Nonwoven Fabrics ("NOW"), began developing a recyclable banner product around 2007, using Tyvek as a substrate.  (Pl. 56.1 Response ¶ 54; Teather Tr. 23-24).  The lead developer for NOW, Eric Teather, reached out to P&IP to obtain resins with which to coat Tyvek around 2008.  (Teather Tr. 44-45; Pryor Tr. 60).  Entira was recommended to Teather by Dr. Seqwana Pryor, a platform leader in P&IP who

---

[12]    Plaintiff disputes that Lee's internal tests concerned recyclable banners specifically.  (*See* Pl. 56.1 ¶ 58).  While Lee and Chou did testify that these tests related to coated fabric applications, of which banners were one component (*see, e.g.*, Chou Tr. 41-42; Lee Tr. 88), this disputed issue of fact is not material to the Court's analysis.

was tasked with finding market applications for E/MAME technology.  (Pryor Tr. 13-15).  To Teather's knowledge, he was the first person at DuPont to coat EntiraCoat[13] onto a substrate for the purpose of creating a recyclable banner or projection screen, in 2007.  (Teather Tr. 47).

In 2007 and 2008, NOW engaged in several joint trials with InterWrap to test NOW's intended recyclable banner formulations.  (Teather Tr. 20, 23).  During those trials, DuPont tested structures in which Entira was extruded along with $TiO_2$ and $CaCO_3$ onto a Tyvek substrate, with a corona finishing treatment.  (Def. 56.1 ¶ 63; Shokar Tr. 47-52).  DuPont filed a patent application in November 2008 that reflected this structure, described by Plaintiff as a "'[r]ecyclable coated banner' in which layers of ethylene acrylic resin [Entira] are affixed, via 'extrusion coat[ing,]' to a 'planar polyolefin banner substrate.'"  (Compl. ¶ 50; Teather Tr. 123-25).

### 5.    The Davis-Standard Trials

After Big Vision entered into contract with Davis-Standard, the two companies began planning a series of laboratory trials to test Big Vision's intended machine specifications.  Three such trials took place at Davis-Standard between 2008 and 2009 (the "Davis-Standard Trials" or the "Trials").  As described herein, the undisputed evidence shows that DuPont was initially solicited by Davis-Standard for information and insights, and ultimately was invited to attend the trials.

---

[13]    Entira 100 and EntiraCoat 100 are different trade names for the same product.  (Chou Tr. 23).

13

> **a.   The First Trial: June 4-5, 2008**
>
> **i.   Preparation for the First Trial and Development of the Trial Plan**

In April 2008, Big Vision sent a polyethylene banner sample that Shailesh Visaria had obtained from "an exhibition or something" to Davis-Standard "[t]o show [them] that's the kind of product that we would like to coat and manufacture." (S. Visaria Tr. 261-63). Big Vision asked Davis-Standard to determine the sample's composition; Davis-Standard, in turn, asked DuPont to analyze the sample, which it did in May 2008. (Def. 56.1 ¶ 96; S. Visaria Tr. 262; Ex. 33).

On May 8, 2008, Ken Piora, a sales manager at Davis-Standard, forwarded the laboratory results to Visaria, writing:

> Essentially, [the sample] is a monolayer 65 micron LD[PE]/LLD[PE] coating with CaCO3 onto the PP [polypropylene] fabric. Actual percentage of CaCO3 is [s]till being tested, but is believed to be 10-12%. From discussions with DuPont, they're recommending coextrusion of LD[PE]/LLD[PE] with their Entira Coat 100.[14] They claim the Entira coat has excellent bonding strength to the nonwoven and accepts digital inks very well. Of course we can make our laboratory available for any trials.

(Ex. 33; S. Visaria Tr. 302-04). The "discussions with DuPont" referenced in the e-mail had begun the previous day, when Piora had written to Dr. Seqwana

---

[14]   Ken Piora was not deposed in connection with this action. (Nov. 5 Tr. 7). DuPont cites this e-mail as proof that it had suggested coextruding LDPE and Entira prior to the First Trial (Def. 56.1 ¶ 96), but overlooks the fact that Piora's statement is hearsay and cannot be put forth for the truth of the matter asserted. *See Presbyterian Church Of Sudan* v. *Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (noting that "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment" (internal citation omitted)). However, the uncontroverted evidence shows that DuPont had extruded LDPE and Entira for use in a banner application as of at least February 2008. (Teather Tr. 70-73). In any event, this issue is not material to the Court's analysis.

Pryor in DuPont's P&IP division.  (Ex. 35 at DSP0026771).  Piora related to Dr. Pryor that he was working "on a banner project in India [] that is very active," and asked her, "[i]n your experience what would be the coating thicknesses (A/B) for this type of banner application[?]"  (*Id.*).  Dr. Pryor recommended a coating thickness of [redacted] mils, and attached a data sheet on EntiraCoat. (*Id.* at DSP0026770; Pryor Tr. 78-79).

Piora replied by noting that "the banner material will be primarily a nonwoven substrate," and then asked Dr. Pryor to clarify the layer distribution and coating weights for the banner application.  (Ex. 35 at DSP0026769).  Dr. Pryor explained:

> you could do [redacted]mil A coating/ B (nonwoven) /[redacted]mil A coating … the key is to get enough coating to print on, the strength will come from the nonwoven substrate … in some applications we've gone as high as [redacted]mil.  [Dr. Pryor then suggested the use of an additive package containing a flame retardant, and shared that in DuPont's experience] Entira Coat/PE [polyethylene] or Entira Coat as the A laminate/coating gives you the best … feel & drapability [] and printability as an alternative to PVC coated banners.

(*Id.* at DSP0026768; Pryor Tr. 78-79).

Piora then advised Dr. Pryor that

> [o]ur potential customer would like to run a lab trial at our Fulton, NY facility on June 2-5[, 2008].  The end product is advertisement banners with digital printing.  Could DuPont donate some resin for this trial? 1000 pounds of Entira.  2000 pounds of LDPE.  We would like to run A/B & B/A/B structures.  We hope DuPont could participate in this trial.

(Ex. 35 at DSP0026767-68).  Dr. Pryor responded that EntiraCoat 100 was "restricted inventory" and that DuPont would need to know the customer's

name and "possibly [have] a confidentiality agreement in place to [perform a] trial [with] the Entira Coat 100."  (*Id.* at DSP0026767; Pryor Tr. 88-89).

Christine Ronaghan, a Davis-Standard process engineer, then drafted the trial plan for the First Trial with input from Ken Piora and Big Vision. (Ronaghan Tr. 39).  Ronaghan was aware that Piora had reached out to Dr. Pryor at DuPont for advice regarding coating thicknesses, which Big Vision and Piora had discussed before, but recalled that Big Vision had not "actually nailed down exactly what they wanted to do."  (*Id.* at 74).  More to the point, Ronaghan testified that prior to the First Trial, Big Vision

> had targeted a specific coating weight [and] had targeted layer structures. We had discussed, again, being two layers. There's some options; A/B; A/B/A. We talked about that. And — and they had made some recommendations and we agreed to what we wanted to try. And they had input on the fabrics. So they chose the fabrics and supplied the fabrics. So they were wholly responsible for that at that point.

(*Id.* at 39).  When asked to describe Big Vision's "recommendations," Ronaghan clarified that they were not so much "recommendations," but instead "requests," such as "[t]his is what we would like to see, this sort of layer structure, they talked about A/B/A.  And they also made some requests in terms of formulation."  (*Id.* at 39-40).  Big Vision has not disputed Ronaghan's testimony in this regard.

Ronaghan also recalled that Big Vision "had asked for some assistance [] in taking a first stab at selecting these masterbatches," so Davis-Standard "consult[ed] the suppliers of those materials and ask[ed] for their recommendations."  (Ronaghan Tr. 40).  Big Vision does not dispute that it

asked Davis-Standard to select the masterbatches, which included such ubiquitous additives as $TiO_2$ and $CaCO_3$.  (S. Visaria Tr. 384).

On May 23, 2008, Piora sent Visaria a "draft of the proposed 2 day trial plan," solicited comments and suggestions from Big Vision, and asked Big Vision to "tell us the percentages of CaCO3 and when/where you would like the TiO2." (Ex. 131 at BV-00156142-44).  The draft trial plan reflected eight separate B/A/B coating structures: three did not contain Entira; one contained only Entira; and four contained Entira and LDPE, $CaCO_3$, and $TiO_2$.  (*Id.*).[15] The plan also indicated that a variety of finishing treatments would be used. (*Id.*).  In response, Visaria wrote: "[w]e need to use TiO2 in all the structures to make the material white (opaque).  We feel CaCO3 should be added on the top layer as it would help printability." (*Id.* at BV-0015641).  Piora confirmed the precise masterbatches and coating amounts the next day, and promised to submit a revised trial plan "focused on good printing." (*Id.*).[16]

When the parties met at Davis-Standard for the First Trial on June 4, 2008, Visaria began discussing the 3M Patent with the representatives from DuPont and Davis-Standard.  (Pryor Tr. 39, 87-88; S. Visaria Tr. 177-79). Upon hearing this, Dr. Pryor stepped out of the conference room to call her supervisor and request that they execute a confidentiality agreement with Big Vision "to protect all parties … including DuPont." (Pryor Tr. 40, 108-09).  Dr.

---

[15]   The trial plan sent by Piora on May 23 is less detailed than the trial plan contained in duplicative Exhibits 25 and 75 (the "First Trial Plan"), which includes a chart detailing the intended percentages of each additive.

[16]   If such a document exists, it was not included in the record before the Court.

Pryor also testified that DuPont commonly requires its customers to sign a confidentiality agreement in order to use a product, such as Entira, that is in "restricted inventory." (*Id.* at 89).[17]

### ii.    The First Trial

The First Trial was held on June 4-5, 2008. (Def. 56.1 ¶ 97). The DuPont attendees were Drs. Pryor and Chou. (Pl. 56.1 ¶ 157; Ex. 165). The Big Vision attendees were Shailesh Visaria and Dr. Vasudeo. (Vasudeo Tr. 65; S. Visaria Tr. 362).

The Davis-Standard trial report (the "Trial Report") was drafted by Christine Ronaghan, and summarizes all three Trials. (Ronaghan Tr. 117; Ex. 75).[18] The Trial Report notes that Big Vision supplied the substrate, DuPont supplied the Entira, and Davis-Standard chose and purchased the $CaCO_3$ and $TiO_2$ masterbatches from Schulman, a commercial masterbatch manufacturer. (Ex. 75; *see also* S. Visaria Tr. 384 (not disputing this fact); Ronaghan Tr. 117). The Trial Report notes that "many structures" were run, including variations of LDPE coating on the backside, different layering ratios, different coating structures and weights of Entira, different coating structures and weights of $CaCO_3$ and $TiO_2$, and various finishing treatments. (Ex. 75).

---

[17]    Big Vision and DuPont subsequently executed a non-disclosure agreement (the "first NDA"), approximately one month after the First Trial. (Compl. Ex. A). The parties allege that the NDA was executed on July 1, 2008 (Def. 56.1 ¶ 98), but the NDA is dated August 29, 2008, and September 22, 2008 (Compl. Ex. A). The difference is immaterial for the purposes of this Opinion, and so the Court adopts the date proffered by the parties.

[18]    The Trial Report is marked "Davis-Standard Confidential," but Ronaghan testified that the confidentiality footer is part of the standard template she uses. (Ronaghan Tr. 131).

The parties now dispute what was tested at the First Trial. It is undisputed that only A/B/A structures were coextruded onto various nonwoven substrates; that one structure was comprised only of Entira; and that other structures were comprised of varying combinations of Entira (in concentrations of [redacted]-[redacted]%), LLDPE, LDPE, $TiO_2$ (at [redacted]%), and $CaCO_3$ (at [redacted]%). (*See* Pl. 56.1 ¶¶ 158-59; Def. 56.1 Response ¶¶ 158-59). The parties further agree that LDPE and LLDPE, $TiO_2$, or $CaCO_3$ structures were tested without Entira, but DuPont argues that the LDPE structures were coated only on the back, non-printable side of the substrate. (*Id.*).[19]

---

[19]   Plaintiff does not dispute this fact, but the record does, inasmuch as documents associated with the First Trial indicate that at least some samples were produced with LDPE coated on the front and back sides. Resolution of this issue is complicated by the fact that the documents that Big Vision claims reflect its trade secret — the Trial Plan, Trial Report, run reports, and roll identification sheet — are cryptic at best.

The Trial Report was drafted by Davis-Standard and summarizes the outcomes of all three trials. Attached to the Trial Report are the trial plans for all three trials and the roll identification form for the First Trial. (Ex. 75; Ronaghan Tr. 117). The trial plans for the three trials (collectively, the "Trial Plans") include for each a chart detailing the intended formulations of ingredients and a list of the various structures to be tested. The run reports (collectively, the "Run Reports") are contemporaneous machine printouts produced at each trial. (Ex. 76, 77, 78).

The First Trial Plan includes nine A/B/A structures [numbered 1-6, 6a, 6b, and 8], three of which [2, 4, 6a] would also be coated with LDPE on the backside. (Ex. 75 at BV-0012179-80). By cross-referencing the additive chart on the first page of the Trial Plan [Blends A-E, G, A1, and E1], one can determine the intended percentages of certain additives in certain layers. (*Id.*). The Run Reports each identify the roll number and coating thickness used; the columns "A Extruder" and "B Extruder" on each run report refer to the Blend number specified in the trial plan, but not the structure numbers. (Ex. 76). The roll identification sheet ("Roll Identification Sheet"), annexed to the Trial Report, lists the roll numbers [1-48] and the structure numbers tested [1-6, 6a, 6b, 8], the finishing treatments used on the rolls, as well as the date on which, and where, the rolls were shipped after the trial. (Ex. 75 at BV-0012181).

Through substantial effort (which the parties surely could have saved the Court), one can cross-reference the 24 pages of machine printouts that comprise the Run Reports from the First Trial (*see* Ex. 76), with the Trial Plan (Ex. 75 at BV-0012179-80), the additive chart in the Trial Plan, and the Roll Identification Sheet (*id.* at BV-0012181), in

### b.    The Second Trial: August 5-6, 2008

#### i.    Preparation for the Second Trial and Development of a Trial Plan

The second Davis-Standard trial (the "Second Trial") was held on August 5-6, 2008.  (Def. 56.1 ¶ 101).  Ahead of the Second Trial, Ken Piora wrote to Drs. Pryor and Chou at DuPont on July 22, 2008, stating:

> During our last trials you mentioned that you were going to make suggestions on the blended materials.  We do plan to blend the ENTIRA with TiO2, CaCO3, UV.  Could you be so kind and make recommendations on the above?

(Ex. 36 at DSP0006146).  Upon receiving no response, Piora wrote again six days later:

> I have been in contact with Shailesh of Big Vision and he mentioned that you were in communication with him about the resin. 1 - Do you plan to participate in the trial? 2 - What is the status of the ENTIRA resin? 3 - Christine has been trying to get in contact with your colleague about the TiO2, CaCO3 & UV concentrates with no success yet…. Is there anyone else?  As you can imagine, I am getting nervous since the trial is within 7 days.

(*Id.*).

H.I. Lee responded to Piora's request the next day:

---

order to determine roughly what was tested at the First Trial.  The Trial Plan notes that on the first day, Structures 1, 2, 3, and 4 would be tested (which included LDPE, TiO$_2$, and CaCO$_3$), and Structures 2 and 4 would include LDPE on the backside as well.  (*Id.* at BV-0012179).  The Roll Identification Sheet indicates that Rolls 1, 2, and 3 were printed with LDPE on the backside (*see* Ex. 76 at BV-0027122, BV-0027133, BV-0027139) and then reused for Structures 2, 4, and 6a (Rolls 9-13, 10-23, and 34-38).  (Ex. 75 at BV-0012181).  Thus, Rolls 4-23 (*see* Ex. 76 at BV-0027140-45, BV-0027123-25) were printed with Structures 1, 2, 3, and 4, which included LDPE, TiO$_2$, and CaCO$_3$, but not Entira (Ex. 75 at BV0012179, BV-0012181).  Given the considerable effort necessary to determine what was tested at the trials, and the fact that Plaintiff concedes that not every structure reflects its alleged trade secret (Pl. 56.1 ¶ 159), it is remarkable that Plaintiff has done little more to define its purported trade secret than refer Defendant and the Court to these materials.  *See* Discussion Sec. C(2)(a), *infra*.

> In regards with the blend ratio of TiO2, CaCO3, UV with Entira Coat 100, I believe it would [] depend on the customer's requirements for the opacity, UV blocking performance, etc. I don't know if you have blended these additives in your previous trial run ... but [redacted]% blending of TiO2 would be a good starting point from my experience. We can increase blend ratio of TiO2 in further if it is needed, such as [up to] [redacted]~[redacted]% ... I hope you Ken or Christine can talk to Shailesh as to this subject — what level of these additives he wants to blend with Entira Coat 100.

(Ex. 36 at DSP006141-42; Lee Tr. 206-09).

### ii.    The Second Trial

The Second Trial was attended by Dr. Chou, H.I. Lee, Shailesh Visaria, Urmil Visaria, Manish Avashia, and Dr. Vasudeo. (Lee Tr. 79-191; S. Visaria Tr. 364; U. Visaria Tr. 129; Avashia Tr. 33; Vasudeo Tr. 56). According to the Davis-Standard Trial Report prepared after the trial, UV additive was included for the first time per the recommendation of Schulman (the masterbatch supplier chosen by Davis-Standard), and Davis-Standard chose and purchased the $CaCO_3$, $TiO_2$, and UV additives. (Ex. 75; Ronaghan Tr. 117-18). The report noted, and Ronaghan confirmed, that "many fabrics and various coatweights were evaluated"; that "[s]everal changes were made [] to processing temperature, blend formulation, etc."; and that the "removal of the UV additive" seemed to improve the appearance." (Ex. 75; Ronaghan Tr. 117-18). The amounts of $TiO_2$ and $CaCO_3$ were increased up to [redacted]% and [redacted]%, respectively. (Ex. 75; Ronaghan Tr. 117-18).

The parties again dispute before this Court what was tested at the Second Trial. Plaintiff states that LLDPE- and LDPE-only structures were run, in addition to several structures combining Entira and LDPE. (Pl. 56.1 ¶ 167).

Defendant argues instead that LDPE was only coated on the reverse, non-printable surface.  (Def. 56.1 Response ¶ 167).[20]

Shailesh Visaria testified that DuPont made additive suggestions ahead of the Second Trial, and that the parties "worked together" during that Trial to "try and identify why the problems are coming in."  (S. Visaria Tr. 350-51). Visaria further testified that the concentrations of additives were changed during the Trial.  (*Id.*)  Similarly, Urmil Visaria described the Second Trial as a "collective call between Davis-Standard and [Big Vision] and DuPont."  (U. Visaria Tr. 129).  He also recalled that the "UV additives [were] not compiling with Entira," so "we jointly discussed it and [the UV additives were] removed and after that it ran perfectly all right."  (*Id.* at 130).  Urmil also testified that it was a "joint decision" to increase the amount of $TiO_2$, and $CaCO_3$ by [redacted] to [redacted] percent at the trial.  (*Id.* at 130-31).

Conversely, Christine Ronaghan testified that Big Vision was "struggling" to come up with the formulation to use, and only conveyed its desire for a more opaque product; it was either Ronaghan or Lee who suggested the specific amount of $TiO_2$ to use.  (Ronaghan Tr. 97-100; Lee Tr. 67-71).  Urmil also testified (and DuPont disputes) that Big Vision determined that the amount of Entira should be downgauged to [redacted] percent in the Second Trial (from

---

[20]    The Trial Plan for the second trial (the "Second Trial Plan") states that on Day 1, the backside of each fabric was coated with LDPE, $TiO_2$, and $CaCO_3$ [Blend H] in an A/B/A structure.  (Ex. 75 at BV-0012182).  On Day 2, Entira was coextruded with $TiO_2$, $CaCO_3$, UV additive, and LDPE in an A/B/A structure onto the front side [Blends J, H1].  (*Id.*).  On Day 3, LDPE, LLDPE, $TiO_2$, and $CaCO_3$ were coated onto the front side [Blends I, H1].  (*Id.*).  While the Court resolves this non-material dispute in Plaintiff's favor, it notes that the Trial Plan supports Plaintiff's assertion that LDPE/LLDPE structures were printed on the front side of the substrate.

the [redacted] percent used in the First Trial) in order to "reduce cost."  (U.

Visaria Tr. 131; *but see* Def. 56.1 Response ¶ 166 (arguing that Big Vision did

not choose the Entira amount because "H.I. Lee and Davis-Standard ran the

[Second Trial]")).  The parties have not alleged what percentages of Entira were

tested at the Second Trial, and the Trial Plan and Run Reports do not clearly

indicate the amounts of Entira tested.  (*See* Pl. 56.1 ¶ 167; Ex. 75, 77).

### c.    The Third Trial: June 5, 2009

The third Davis-Standard trial (the "Third Trial") occurred on June 5,

2009, and was attended by Shailesh Visaria and Dr. Vasudeo from Big Vision;

Diane Hahm and Dr. Chou from DuPont's P&IP division; and Rob McPheeters

from DuPont's NOW division.  (Def. 56.1 ¶ 102; S. Visaria Tr. 376; Vasudeo

Tr. 58; Hahm Tr. 129; Chou Tr. 229).[21]

Diane Hahm testified that she drafted the trial plan for the Third Trial

(the "Third Trial Plan") with input from Davis-Standard personnel, who

conveyed Big Vision's "goal" to manufacture a recyclable, white, non-PVC

banner.  (Hahm Tr. 96-98).  Big Vision does not dispute this testimony.  (Pl.

56.1 Response ¶ 102).  Christine Ronaghan testified similarly that Hahm

recommended and supplied the additives for the formulations that were run at

the Third Trial.  (Ronaghan Tr. 116).  Hahm recalled that Big Vision asked for

DuPont's assistance because "they didn't have any processing experience … of

---

[21]    The circumstances that led to NOW's participation in the Third Trial are discussed *infra*, at Background Sec. A(8)(a).

their own." (Hahm Tr. 94, 96-98). Shailesh Visaria conceded that DuPont suggested the additives for the Third Trial. (S. Visaria Tr. 387-88).

> The Davis-Standard Trial Report stated:

> The objective of the third trial was to process *the DuPont recommended formulations* in an AB structure onto various grades of CLAF [nonwoven] fabric. The scope of the trial was not a continuation of Trial 2, since all additive packages were different, and the UV and FR [flame retardant] were new to the blend. In retrospect, the amounts of materials supplied, including fabric, additives, LDPE were inadequate given that the formulations and materials had all changed.

(Ex. 75 (emphasis added); Ronaghan Tr. 118-21). The Trial Report further noted that "DuPont made additive recommendation[s] based on previous experience in their lab with the Entira resin and various masterbatch grades." (Ex. 75; Ronaghan Tr. 116, 134-35). The formulations included $TiO_2$, $CaCO_3$, UV additives, and flame retardants. (Ronaghan Tr. 116).

The Trial Report noted that "[t]here remain several concerns over formulation [including opacity from the $TiO_2$ levels, the level of flame retardancy, and the additive package to be selected].... DuPont will be issuing a report on formulation and planned testing at their site to assist [Big Vision] in defining the required blends for their application." (Ex. 75; Hahm Tr. 118-19 (testifying to the internal tests DuPont ran for Big Vision in order to troubleshoot the die-buildup issue experienced at the Third Trial)). The Report also detailed the various structures and formulations run, and the problems encountered with each. (*Id.*). The Report ended by noting that "substantial questions regarding the optimal formulation still exist," and recommended that

DuPont work with Big Vision to "optimize blend formulation" at small-scale tests at DuPont.  (*Id.*).

Diane Hahm recalled that at the Third Trial, the $TiO_2$ percentage was increased to [redacted] percent, which, in Hahm's opinion, caused the "mixing" to become poor and the samples to have a "very poor appearance." (Hahm Tr. 103).  Hahm also testified that at the trial, she "explain[ed] the trial plan [to Big Vision] and explained the extrusion coating process, because they were not familiar with that whole process." (*Id.* at 98).  Hahm prepared a post-trial report, in which she recommended a three-layer coextruded option as the easiest structure to run at the lowest cost.  (*Id.* at 104-05).  Going forward, Hahm promised to research for Big Vision whether the product's opacity could be increased by any means other than increasing the $TiO_2$ level.  (*Id.* at 106).

Visaria wrote Davis-Standard shortly after the Third Trial to express his "extreme[] disappoint[ment with] the way [the] trial had been conducted and concluded." (Ex. 19).  In the e-mail, Visaria reviewed the different structures and formulations run during the trial, and concluded:

> this has been our third trial and we have always failed to run proper UV, FR, $TiO_2$ and $CaCo_{[3]}$ with or without Entira.  Plus what the point of all the planning and trials when you tell me at the trial that the Entira and LDPE have different melting point.  I think we should have been informed if that was the problem th[e]n we could have taken corrective steps before.

(*Id.*; S. Visaria Tr. 361 (agreeing with this statement)).  In response, Davis-Standard noted that the "[s]pecific additive packages for opacity and flame retardants, whether for LDPE or Entira are well outside our area of expertise… DuPont has expressed this same concern, and is devoting a lot of effort into

developing that additive package." (Ex. 21).  Visaria and Davis-Standard exchanged several e-mails in July 2009 regarding the proper amount of $TiO_2$ to use with Entira, in order to correct certain problems that were encountered at the Third Trial.  (Ex. 22-23; S. Visaria Tr. 373-74).  Subsequently, Davis-Standard described the different structures run in the Second and Third Trials, and stated that the additive package was currently "undetermined because of Big Vision's evolving product requirements."  (Ex. 23).

The parties planned a fourth trial for July 2009.  In e-mails between Visaria and Hahm in early July 2009, Visaria sent his proposed formulation for a three-layer structure.  (Ex. 38; S. Visaria Tr. 375 (noting that the formulation he sent included structures run at the Second Trial)).  In response, Hahm noted that "[t]here are still a few things we have to determine [including flame retardant levels and the thickness of LDPE and reclaim layers in order to impart opacity].... [W]e will be working to give you guidance on this."  (*Id.* at DSP0014418-19; Hahm Tr. 118-19).  Hahm reassured Visaria that "Entira Coat is being commercially run today for banners [and...] its processing characteristics are well known."  (Ex. 38 at DSP0014419; Hahm Tr. 112)).  Hahm further noted that the Third Trial did not produce useful samples because "there was just too high a temp run, and then too high a TiO2 level run."  (Ex. 38 at DSP0014419).  In a later e-mail, Hahm noted that "the operators threw in [redacted]% of the TiO2 masterbatch in the LDPE[, which ...] was over the limit we set [of] [redacted]% of masterbatch," and that as a result Hahm "knew the samples would look awful."  (*Id.*; Hahm Tr. 117-18 (confirming

26

that [redacted]% $TiO_2$ was tested); S. Visaria Tr. 378 ("we went up to, I think, [redacted] percent [$TiO_2$]")).

Throughout July 2009, Visaria and Hahm continued to discuss the proper formulation and structures to employ.  (*See* Ex. 39).  Later in 2009, however, Big Vision terminated its relationships with both Davis-Standard and DuPont.[22]

### 6.   Big Vision's Contacts with Additional Third Parties Regarding Its Recyclable Banner Project

After the Second and Third Trials, Big Vision contacted at least 11 different third parties, and appeared to seek a new machine manufacturer.  (S. Visaria Tr. 191-95, 204-18; Shokar Tr. 33-35; Ex. 66-72).  Big Vision disclosed its intended recyclable banner formulation in considerable detail, while continuing to disclose the "recipe" from the 3M Patent.  (S. Visaria Tr. 191-95, 204-18; Shokar Tr. 33-35; Ex. 66-72).  Shailesh Visaria conceded that he did not enter into written confidentiality agreements with any of those third parties, but alleges that he orally "communicated with them [his] confidentiality."  (S. Visaria Tr. 191-95, 204-18).  In at least one instance, however, Visaria disclosed Big Vision's intended formulation to a manufacturer

---

[22]   Big Vision subsequently avoided its contract with Davis-Standard.  (Pl. 56.1 Response ¶ 49).  In October 2009, Davis-Standard initiated a lawsuit against Big Vision in the United States District Court for the Northern District of New York alleging various claims, including breach of contract.  *See Davis-Standard, LLC* v. *Big Vision Private Ltd.*, No. 09 Civ. 1160 (NPM) (GHL) (N.D.N.Y.), Dkt. #1.  Big Vision counterclaimed and sought to implead DuPont, but its effort was rebuffed by that court in May 2011. (NDNY Dkt. #32).  Davis-Standard and Big Vision settled their claims in September 2011. (NDNY Dkt. #42, 43).  Thereafter, Big Vision brought the instant action in November 2011.

without any prior or subsequent communications to "ensure confidentiality."
(Ex. 68; S. Visaria Tr. 209-10).

### 7.   Big Vision's Indian Patent Application and Continued Banner Development

On June 30, 2009, Visaria filed a patent application in India for "a graphics substrate for digital printing application and method of manufacturing thereof." (Ex. 74; No. 1536/MUM/2009). Indian patent applications are publicly available, and Visaria requested early publication of the same. (S. Visaria Tr. 405; *see* http://ipindiaservices.gov.in/patentsearch/ PublishedSearch/publishApplicationNumber.aspx?application_number=muSK PXpSpbKLViTuhKFeSg==). Visaria testified that the patent "was a much [] broader and wider patent in [terms] of the process" than Big Vision's proffered trade secret. (S. Visaria Tr. 406-07). Yet the patent disclosed, among other things:

    i.    A nonwoven polyethylene "core layer" having good tensile strength;

    ii.    A top layer comprising $CaCO_3$, LDPE, or LLDPE;

    iii.    Extrusion coating; lamination; and coextrusion;

    iv.    Thickness of the top layer kept at a minimum, including the use of copolymers and "acrylic materials"; and

    v.    Corona, plasma, flame, or E-Beam finishing treatments.

(Def. 56.1 ¶ 120; Ex. 74). Visaria acknowledged that the patent referenced "learnings [from] the Second Trial." (S. Visaria Tr. 410-11).

Big Vision continued to conduct trials from 2009 through 2011 to further refine its recyclable banner formulation, both in-house and at third-party

manufacturers' facilities.  (U. Visaria Tr. 23-34).  Big Vision settled on its desired recyclable banner formulation around 2011, ultimately adding the terpolymer TX 8030 and the resin paraloid.  (*Id.* at 25-27, 33-34).  Big Vision does not intend to use Entira.  (*Id.* at 33-34).  As of January 2013, Big Vision had yet to manufacture in-house, or to sell, a recyclable banner.  (S. Visaria Tr. 79).

### 8. DuPont's Continued Development of Recyclable Banners

### a. NOW's Discussions with Big Vision in 2008-2009

Starting in July 2008, Big Vision was introduced to DuPont's NOW division to discuss using one of their nonwoven fabrics, such as Tyvek, as a substrate.  (Pl. 56.1 ¶ 206; Def. 56.1 Response ¶ 206).  A representative from NOW attended the Third Trial for this reason, and in July 2009, NOW and Big Vision signed a second NDA (the "second NDA"; collectively with the first NDA, the "NDAs").  (Def. 56.1 ¶ 103; Def. 56.1 Response ¶ 206).  The second NDA was identical to the first NDA, save for a somewhat broader purpose, that of exploring "a possible business opportunity of mutual interest regarding graphic products."  (Compl. Ex. B).  Annette Kim, a marketing manager in NOW, explained that NOW personnel did not know whether the first NDA applied to both P&IP and NOW (which it did, *see* Discussion Sec. B(3), *infra*), so NOW and Big Vision executed a second NDA "just to make sure."  (Kim Tr. 9, 257-58).

As a result of NOW's discussions with Big Vision, a number of e-mails were circulated within NOW between 2008 and 2009 regarding Big Vision, several of which are cited by Plaintiff in support of its current claims.  In the

context of NOW's discussions with Big Vision, Steve Wilkinson, a NOW

employee, circulated a PowerPoint presentation entitled "Key Learnings From

Big Vision" to a number of people within NOW.  (Ex. 95).  In the cover e-mail,

Wilkinson wrote:

> Meeting Big Vision in Mumbai was key for me to really understand
> at first hand their business model (and for us to further compare
> with Nonwoven's model).  [ ] This company certainly appears to be
> in the correct location of the value chain to help gain business
> from[] PVC, they have done their homework and are confident that
> they have lowered their total system cost [and] can compete on
> price.
>
> Key will be to see just how good they are at influencing the
> industry to change.  As you know, their move to back integrate and
> purchase coextrusion technology is key to help them lower costs.
>
> [T]hey have tried to find other banner material than Entira Coat
> but say we have an advantage in that our materials print on a wide
> variety of printers and is [a] more robust solution …
>
> For us, how do we find similar channel partners in other key
> countries that have large amount fo[r] banner Ads running
> constantly through their country like India!?
>
> I'm doubtful that Nonwovens has a) the right costs in banner
> material design due to their margins to compete against PVC,
> b) that Nonwovens has the recycle loop securely figured into their
> launch plans.

(*Id.* at DSP0009538-39).[23]  The slides in the PowerPoint presentation include

(i) "What are the key needs that Entira Coat meets for Big Vision" (including

attributes and benefits like printability, recyclability, and weight); and (ii) "Big

Vision's Recyclable, Non-PVC Banner, Business Model — The Recycle cycle."

---

[23]    While Wilkinson was deposed, the transcript from his deposition was not submitted in
connection with this motion.  (Nov. 5 Tr. 7).

(*Id.* at DSP0009540-42).  DuPont's role in selling Entira to Big Vision is highlighted in the recycle loop slide.  (*Id.* at DSP0009542).

Around July 2009, NOW engaged in further discussions with Big Vision in order to ascertain whether Big Vision could be a "toll coater" for DuPont, meaning that Big Vision would manufacture banners pursuant to DuPont's specifications, but that DuPont would market and sell the products.  (Kim Tr. 98-99).  The discussions appeared productive from both sides.  On July 7, 2009, Shailesh Visaria e-mailed Annette Kim and other employees of DuPont's NOW division, and noted that he would be sending them banner samples that had been printed on solvent inkjet and UV inkjet machines.  (Ex. 99 at BV-0011782; Kim Tr. 263-67).  He detailed the technical specifications of the extrusion coating machine Davis-Standard was building for Big Vision, and asked Kim if the "configuration would meet your coating requirement."  (*Id.*). He then asked Kim what DuPont's coating requirement would be, and their current business model for toll coating companies.  (Ex. 99 at BV-0011782). Visaria closed the e-mail by writing "[n]eedless to say all the information we share on our product in all our communication needs to be dealt with utmost confidentiality."  (*Id.*).  Kim replied by noting that they were in the process of drafting a confidentiality agreement.  (*Id.*; Kim Tr. 263-67).  Several days later, Visaria asked Kim to send Big Vision certain samples for inkjet and solvent inkjet printing.  (Ex. 99 at BV-0011779-81).

In early April 2010, Annette Kim drafted a presentation for NOW entitled "Sustainability Is a Business Imperative."  (Ex. 96).  The presentation noted

31

that "DuPont Tyvek Vivia is a sustainable solution," and that "DuPont Tyvek is recyclable and reusable." (*Id.* at DSP0962596-97). The presentation outlined a "DuPont Life-cycle Based Solutions" program in which "[t]hrough an alliance with Waste Management, we've created a national ship-back recycling program to capture the items printed on DuPont Tyvek Vivia." (*Id.* at DSP0962601-02). In response, Steve Wilkinson wrote that "[t]his is very similar to the Big Vision idea [...] let's hope we see some sales!!" (*Id.* at DSP0962587).[24]

### b.   DuPont's Internal Evaluation of a Potential Commercial Relationship with Big Vision

Following the Second Trial, and in light of Dr. Chou's sales estimates of Entira to Big Vision in the range of several million pounds per year, NOW began discussions with P&IP regarding a "One DuPont" approach. (*See* Ex. 167; Kim Tr. 77-80; Chou Tr. 215-18; Welchel Tr. 19-20). The idea behind "One DuPont" is that although each division reports its own profit and loss statements, partnerships between divisions that would benefit DuPont as a whole are encouraged. (Kim Tr. 77-80). Thus, NOW and P&IP began discussing the costs and benefits of several different approaches, including (i) selling Entira and NOW's fabrics to Big Vision as customer; (ii) using Big Vision as a toll coater; or (iii) having NOW enter into an exclusivity agreement with P&IP so that P&IP would not sell Entira to a potential competitor like Big Vision. (*Id.* at 77-80, 95-99; Welchel Tr. 35-45; Ex. 188, 189).

---

[24]   DuPont contends, without contradiction in the record before the Court, that it does not use this business model, has no capability of using reclaimed material, and does not utilize a recycling loop. (Def. 56.1 ¶ 33).

Wayne Welchel, a business development manager in DuPont's P&IP division, worked with P&IP and NOW to calculate the potential sales DuPont might experience in each of the above scenarios.  (Welchel Tr. 35-45).  As part of those calculations, Welchel obtained from H.I. Lee the coating thickness of Entira tested at the First and Second Trials, since the amount of Entira sold directly corresponded to the amount used.  (*Id.* at 40-45, 92-95; Ex. 188, 189).  Around that time, the sharing of information regarding Big Vision between NOW and P&IP caused another P&IP employee, Kevin McAllister, to protest that P&IP should not be "sharing key learnings of downgauging with NOW" and that it was a "problem which need[ed] to be rectified IMMEDIATELY."  (Ex. 189).[25]  Welchel made clear that he did not share the concerns implicated by McAllister's e-mail, since in his experience, "customers will always downgauge products that in turn result in less of [P&IP's] material being used."  (Welchel Tr. 108-09).

Welchel shared his financial calculations with NOW in order to evaluate the benefit to DuPont of each option.  (Ex. 181; Welchel Tr. 73-74).  Welchel summarized this e-mail by stating "[b]ased on what I've done so far, there is so much difference in the products, the only question is will NOW get any business at all, even replacing the fabric with a cheaper nonwoven."  (Ex. 181; Welchel Tr. 92-96).  Welchel testified (again, without contradiction in the record) that his comment was made in the context of evaluating DuPont's

---

[25]   While Kevin McCallister was deposed, the transcript from his deposition is not part of the record before the Court.

potential relationship with Big Vision, and reflected his view that if Big Vision were to use a product with anything less than 100% Entira, it would be more cost-competitive in lower-cost markets than NOW's existing 100% Entira offerings.  (Welchel Tr. 92-96).[26]

Welchel subsequently circulated a PowerPoint presentation evaluating the various "One DuPont" options regarding recyclable banners.  In that presentation, Welchel wrote: "If we mimic Big Visions' structure, what value does One DuPont bring?"  (Ex. 188).  The bullet points under that statement read "non-DuPont fabric" and "downgauge, dilute Entira coating."  (*Id*.).  Welchel testified that he did not recall suggesting that NOW "mimic" any structure, and certainly did not speak with any NOW scientists or chemists regarding the project.  (Welchel Tr. 58-59, 96-97).  Welchel testified that the word "mimic" referred to a "more downgauged structure that in turn result[ed] in less potential revenue to P&IP."  (*Id*.).  In other words, if NOW used less Entira, as Big Vision planned to do, it would result in lower sales of P&IP's resin.  (*Id*.).

### c.    Continued Recyclable Banner Development

Tom Benim took over the NOW recyclable banner project from Eric Teather in 2008, and continued development of DuPont's Vivia line throughout 2008 and 2009.  (Benim Tr. 174-83).  When Benim took over the project, he

---

[26]    At that time, NOW's existing Vivia recyclable banner was more expensive than a standard PVC banner, and was geared for the high-end North American market.  (Def. 56.1 Response ¶ 185; Ex. 181; Welchel Tr. 92-95).  NOW recognized that Vivia might not be cost-competitive in lower-cost markets.  (Def. 56.1 Response ¶ 185; Ex. 181; Welchel Tr. 92-95).

began development of the "second generation" of Vivia products, which was intended to be a lower-cost product than the "first generation," Entira-only product.  (Benim Tr. 140, 161-64).

In the fall of 2008, Benim participated in a call with P&IP.  (Pl. 56.1 ¶ 194).  His handwritten notes from that call included the words "[redacted] mil," which Plaintiff alleges was the precise coating weight of Entira used in one of the structures tested at the Second Trial.  (*Id*.).[27]  Benim testified that at that time, he was considering a [redacted]-[redacted] mils coating thickness of Entira, and had no recollection of why he wrote "[redacted] mil."  (Benim Tr. 157-58).  Benim testified, without contradiction, that he did was not aware that DuPont P&IP had participated in joint trials with Big Vision, and did not recall speaking with anyone in P&IP regarding those trials, including the fact that Entira had been downgauged at those trials.  (Benim Tr. 124, 158-59).  As of August 2008, Benim was aware that there was at least one company developing lower-cost banners by using less Entira.  (*Id.* at 164-65).  Benim further testified that he first learned of Big Vision in July 2009.  (*Id.* at 157-58).

Benim conducted a test in January 2009 at DuPont's Egan extrusion coating line in which he coextruded Entira with LDPE.  (Benim Tr. 170-84).

---

[27]  Big Vision's assertion is not clearly supported by the record.  The Run Reports from the Second Trial list the coating thickness of the entire A/B/A structures (of which Entira only comprised the A layer) as being [redacted] mils.  (*See* Ex. 77).  The coating thickness in the First Trial was listed as [redacted] mils for the A/B/A structures in which Entira was the A laminate.  (*See* Ex. 76).  Thus, it stands to reason that the only structure in which Entira was coated at [redacted] mils was the all-Entira structure tested at the First Trial (Structure 8), which Big Vision now claims does not reflect its trade secret.  (Pl. 56.1 ¶ 159).  However, this discrepancy is ultimately immaterial to the resolution of this motion.

Big Vision alleges that Benim coextruded [redacted]% Entira with [redacted]% LDPE in one layer of the structure, but does not allege the coating weight of Entira used in this structure, much less that it was [redacted] mils.  (Pl. 56.1 ¶ 194; Pl. Opp. 6-7).

In preparation for that test, in December 2008, Benim asked Hahm to order Entira Coat 100 and LDPE so that he could "check a 'coextrude' concept."  (Ex. 118; Benim Tr. 176-84).  Consistent with H.I. Lee's testimony, Benim also testified that in his opinion, coextruding Entira with LDPE was the "natural thing to try" in the "second[ ]generation" of what had previously been an Entira-only product.  (Benim Tr. 160-61, 166).  Benim testified that he had experience downgauging expensive resins as early as 1995.  (*Id.* at 164-65).  Benim did not recall whether Hahm suggested coextrusion.  (*Id.* at 173).[28] Benim continued to test and refine DuPont's recyclable banner products throughout 2009.  (*See generally id.* at 107-09, 122-24, 135-39, 233-50).  In the third quarter of 2009, Benim shifted his development efforts to a high opacity banner product, in response to market demands.  (*Id.* at 237).

DuPont's Vivia 2082 VI product was released in April 2009, and included a single layer of Entira with $TiO_2$, extruded onto a Tyvek substrate.  (Benim Decl. ¶ 5).  Next, DuPont's Vivia 2083 VI was introduced, which consisted of a single layer of LDPE with $TiO_2$ and $CaCO_3$, extruded onto a Tyvek substrate.

---

[28]    Big Vision cites Benim's testimony that he could not recall coextruded structures being considered prior to 2009 as proof that it was only through exposure to the Davis-Standard Trials that DuPont learned of coextrusion.  (Pl. 56.1 ¶ 200; Def. 56.1 Response ¶ 200).  Yet DuPont itself had filed a patent application in 2006, which disclosed coextruded structures for use in banner applications.  *See* n.11, *supra.*

(*Id.* at ¶ 6).  Lastly, DuPont's Vivia High Opacity 2082 HO was introduced, and consisted of two layers of LDPE extruded via multiple-pass extrusion onto a Tyvek substrate, with $TiO_2$, carbon black, and $CaCO_3$.  (*Id.* at ¶ 7).  Of those products, only Vivia 2082HO is available on the market today; the other Vivia products did not sell well.  (Nov. 5 Tr. 5-6).

DuPont released its Imvelo and Imvelo Deco products to the market in 2010 and 2011.  (Nov. 5 Tr. 5-6).  Those products were LDPE-based and included $TiO_2$ and $CaCO_3$, but did not use Entira and were not manufactured by coextrusion.  (Pl. 56.1 ¶ 214).  These products were sold only in Europe, and are no longer commercially available today, in part because they, too, did not sell well.  (Nov. 5 Tr. 5-6).  Overall, the Vivia and Imvelo lines of banners sold significantly less than DuPont had originally forecasted.  (Kim Tr. 34-36, 150-53, 308-09).

## B.    Procedural History

### 1.    The Instant Action

Big Vision filed the instant action on November 23, 2011, alleging claims of breach of contract, misappropriation of trade secrets, and unfair competition.  (Dkt. #1).

### 2.    Big Vision's Shifting Trade Secret Theory

#### a.    As Pled in the Complaint

Of significance to the instant motion (and of some concern to the Court), the trade secret descriptions advanced by Big Vision have changed dramatically over the course of the litigation.  In the Complaint, Big Vision

alleged that its "precise technical innovation" — and the trade secret DuPont misappropriated — was "[a] '[r]ecyclable coated banner 'in which layers of ethylene acrylic resin are affixed, via 'extrusion coat[ing]' to a [planar polyolefin banner substrate]." (Compl. ¶¶ 1, 4, 14-21, 22, 25-27, 33, 48-50; Def. 56.1 ¶¶ 19, 21). Big Vision also alleged that it "devised a way to construct a substrate from a 'non-woven' [] fabric" (Compl. ¶ 17), and that it "figured out [] through a process known as 'downgauging' how to create different price points of banners" (*id.* at ¶ 21). Big Vision further alleged that principal among Big Vision's innovations was the determination of "how to make cost-effective banners that require only the smallest amount of ethylene acrylic resin," by "increasing the relative amounts of less-expensive LDPE and other additives." (Compl. ¶ 21; Pl. 56.1 Response ¶ 18). Big Vision alleged that Entira was an "ethylene acrylic resin." (Compl. ¶ 25).

Big Vision alleged that DuPont misappropriated its "recycle loop," which it defined as "a sophisticated business model 'creat[ing] incentives for every player in the process, from printers to installers to corporate end-users, to share responsibility for the various tasks required to implement a recycle loop.'" (Compl. ¶ 22, 61; Pl. 56.1 Response ¶ 21).[29]

---

[29]    Plaintiff clarified at oral argument on November 5, 2013, that it no longer asserts a trade secret misappropriation claim for its recycling loop. (Nov. 5 Tr. 13-14). Permitting voluntary dismissal of the claim at this stage of the proceeding, however, would be procedurally improper. Instead, and for the reasons *infra*, DuPont is entitled to summary judgment on this claim. *See Muench Photography, Inc.* v. *Houghton Miffline Hardcourt*, No. 09 Civ. 2669 (LAP), 2013 WL 4464002, at *4 (S.D.N.Y. Aug. 21, 2013) (granting summary judgment in defendant's favor where plaintiff sought to voluntarily withdraw claims after defendant served its summary judgment motion); *see generally* Fed. R. Civ. P. 41.

Big Vision lastly described its trade secrets as follows: "its technical designs for a recyclable banner material and the methods and materials necessary to place a high-quality image on that material; proprietary market research concerning the size and drivers of the international market for banners; including detailed cost and margin projections; and designs and models for implementing a feasible and viable 'recycle loop' for collecting and reprocessing used banners." (Compl. ¶ 78).

### b.   As Described in Interrogatories

DuPont filed its answer on December 20, 2011, and the parties proceeded thereafter to discovery for a period of approximately 13 months. (Dkt. #5, 22, 47).  At an initial conference before United States Magistrate Judge Theodore H. Katz on March 12, 2012, in response to questioning from the Court and DuPont regarding what Big Vision actually claimed as its trade secret, Big Vision alleged that "the combination and the process for combining" certain elements disclosed at the Davis-Standard trials constituted its trade secret.  (Transcript of March 12, 2012 Proceedings at 24, 32, 33).  Five months later, on August 22, 2012, DuPont protested before Judge Katz that "Big Vision [has] refused to specify what its trade secret is"; accordingly, Judge Katz required Big Vision to further identify its trade secrets.  (Transcript of August 22, 2012 Proceedings at 7).  Consequently, Big Vision identified its trade secret in a six-page definition submitted as part of a September 24, 2012 interrogatory response.  (Ex. 90).  Among many other things, Big Vision articulated:

      i.     "a polyolefin-based product" with a "chemically similar polyolefin coating like LDPE" (Ex. 16 at 3);

      ii.     "a multilayer structure combining nonpolar polyolefin polymers with polar polyolefin polymers or a post-coating treatment providing polar functionality or both, along with a polyolefin substrate," which is reflected in the structures and formulations run at the Davis-Standard Trials, which were reflected in approximately 70 pages of laboratory materials (*id.* at 3-4);

      iii.    "polyethylene or polypropylene nonwoven substrates, such as Tyvek, Xavan, or CLAF" (*id.* at 4-5);

      iv.    "novel quantities" of additives such as "TiO2, CaCO3, UV-stabilizer, and FR additive" and "introduction of LDPE in significant quantities" (*id.* at 5-6);

      v.     banner products could be "manufactured through a state-of-the-art coextrusion process"; "developing insights including the temperature profile at which an ethylene acrylate copolymer like Entira could be coextruded with LDPE"; the "requisite die structure for coextruding these two resins;" and "the proper screw design for this application" (*id.* at 6); and

      vi.    a "proprietary business model" for the "recycling loop," including financial incentives "for end users to the banners to return the used banners through recycling" (*id.* at 7).

Big Vision lastly alleged that "over the course of its banner development efforts, Big Vision established a banner ... [that] could be used to print with a full range of commercial inks, including UV, solvent, and eco-solvent inks." (*Id.* at 6).

Defendant objected shortly thereafter to Plaintiff's response as vague, writing, "[i]t is now more than ten months since Big Vision filed its complaint, and DuPont has yet to be advised of the trade secrets upon which the complaint is based. As a result, DuPont cannot prepare a defense [...or]

determine if it is using Big Vision's alleged trade secrets." (Ex. 148).

Specifically, DuPont asked Big Vision to:

    i.    "[I]dentify the specific 'solution' which Big Vision maintained as a trade secret [] including the specific substrate, specific coating and specific trade secret combination/formulation" (*id.* at 2); and

    ii.    Identify what constitutes, for example, "appropriate amount[s]," "post-coating treatments," "coating thicknesses," "novel quantities and combinations," "insights," and "novel amount" (*id.* at 2-4); and further noted that

    iii.    The [Davis-Standard Trial documents] "include a number of different materials, blends, equipment, extrusion methods and additives ... which of these does Big Vision claim constitute its trade secret?" (*Id.* at 3).

The parties met and conferred shortly thereafter. (Pl. 56.1 ¶ 219; Ex. 83, 148).  After the meet and confer, Big Vision followed up in writing on October 12, 2012, to confirm that, among other things, (i) Big Vision did not claim a multilayered structure as its trade secret, but rather claimed "the specific multilayered structures" reflected in the Run Reports and Trial Plans from the Davis-Standard Trials; (ii) Big Vision's trade secret "mix of pigments and additives," "coating thicknesses," and "appropriate amounts" were disclosed in the Run Reports and Trial Plans; (iii) Big Vision did not claim "post-coating treatment" or "corona treatment" as its trade secrets; (iv) Big Vision did not claim "downgauging" as its trade secret; (v) its trade secret related to "reducing the amount of functional polyolefin" was disclosed in the Run Reports and Trial Plans; and (v) to the extent Big Vision claimed "novel quantities and combinations" as its trade secret, those were identified in the Run Reports and

Trial Plans.  (Ex. 104).  DuPont subsequently withdrew its threatened motion to compel.  (Pl. 56.1 ¶ 220).

### c.    As Described in Big Vision's Expert Report

Later in discovery, Big Vision's expert witness proffered yet another version of its trade secret, this one a five-element trade secret that the expert claimed was novel in combination, namely:

   i.     a "[s]uitably strong polyolefin central layer";

   ii.    "high pigment levels, including $CaCO_3$";

   iii.   "a layered structure made by coextrusion or a lamination of a predominantly LDPE structure";

   iv.    "minimal use of Entira or other expensive resins"; and

   v.     "surface treatment."

(Ex. 11).  Plaintiff's expert also alleged that the trade secret could be expressed to "include [a] parallel concept [] based on non-functional olefins modified for printability with $CaCO_3$ and optional surface treatments."  (*Id.* at vii).  Big Vision argues that the five-element trade secret was "embod[ied]" in the "precise structures run at the June 2008 trial" (i.e., the First Trial), which were "recorded on Big Vision's behalf by Davis-Standard" and are reflected in the Run Reports and Trial Plans.  (Pl. 56.1 Response ¶ 17).

Big Vision alleges that some of the confidential information it conveyed to DuPont was reflected in DuPont's Provisional Patent Application No. 61/118,129, which concerned a "'recyclable coated banner,' in which layers of ethylene acrylic resin [Entira] are affixed, via 'extrusion coat[ing]' to a 'planar polyolefin banner substrate.'"  (Compl. ¶ 50; Def. 56.1 ¶ 19).  Big Vision alleges

that DuPont later formally filed Patent Application No. 12/624,684, with this same information.  (Compl. ¶ 53; Def. 56.1 ¶ 20).  In its Complaint, Big Vision further alleges that DuPont's Vivia, Imvelo, and Imvelo Deco products reflected use of Big Vision's trade secret.  (Def. 56.1 ¶ 22).  Big Vision subsequently acknowledged that two of DuPont's Vivia products that were brought to market in 2009, 2085 VI and 2082 VI, were developed solely by DuPont, but claimed nonetheless that DuPont "used its exposure to Big Vision's work to troubleshoot the technical shortcomings that i[t] faced with its original Vivia product."  (*Id.* at ¶ 23; Pl. 56.1 Response ¶ 23).[30]

### 3.     The Instant Motion

This case was reassigned to the undersigned on June 25, 2013.  (Dkt. #50).  Pursuant to instructions from the Honorable Andrew L. Carter, the District Judge then assigned to the case, DuPont filed a motion for summary judgment on July 26, 2013, which motion was fully briefed on August 30, 2013.  (Dkt. #56, 57, 58, 59, 60).  All materials related to the motion for summary judgment were filed under seal pursuant to a protective order entered by Magistrate Judge Katz on April 26, 2012.  (Dkt. #25).  Oral argument was held before the Court on November 5, 2013.  (*See* Dkt. #61).

On February 10, 2014, the Court filed an unredacted copy of this Opinion under seal.  On that same day, the Court provided the parties with a copy of both the unredacted Opinion and of the Court's proposed redactions to

---

[30]    While Big Vision claimed in its Complaint that the Imvelo and Imvelo Deco products reflect its trade secret, it appears to have abandoned that claim in its opposition papers. (*See* Pl. Opp. 22).

that Opinion.  Pursuant to the Court's directions, the parties will file their

summary judgment materials publicly by February 28, 2014, with certain

limited categories of information redacted.[31]  The corresponding portions of this

Opinion will then be redacted and filed publicly.  The Court now considers the

pending motion for summary judgment.

## DISCUSSION

### A.    Applicable Law

Under Fed. R. Civ. P. 56(a), summary judgment may be granted only if all

the submissions taken together "show[] that there is no genuine issue as to any

material fact and the movant is entitled to judgment as a matter of law."  *See*

*Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating "the absence

of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is

"material" if it "might affect the outcome of the suit under the governing law,"

and is genuinely in dispute "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also*

*Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).

The movant may discharge this burden by showing that the nonmoving party

has "fail[ed] to make a showing sufficient to establish the existence of an

---

[31]     After considering the factors implicated by *Lugosch* v. *Pyramid Co. of Onondaga*, 435
F.3d 110 (2d Cir. 2006), the Court permitted the parties to redact the precise
percentages and amounts in the various formulations claimed as trade secret by Big
Vision, as well as certain other limited categories of information.

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

   If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

**B.**     **Big Vision's Breach of Contract Claim Fails**

The first of Big Vision's claims, for breach of contract, is predicated on the two NDAs it executed with DuPont.  In brief, Big Vision claims that it disclosed information to DuPont during and in connection with the Davis-Standard Trials that was (and, more importantly, that was designated under the NDAs as) confidential, and that DuPont subsequently used this information in violation of the parties' agreement.  Because Big Vision did not in fact designate the proffered information as confidential pursuant to the express terms of the NDAs, DuPont did not breach any agreement with Big Vision, and summary judgment is warranted.

**1.**     **Relevant Facts**

Under the terms of the NDAs, information is "Confidential" if it is disclosed (i) "in writing, or in other tangible form, and designated confidential in writing at the time of disclosure"; or (ii) "orally or visually, summarized and confirmed confidential in writing within thirty (30) days."  (Compl. Ex. A, B at Sec. 1; Def. 56.1 ¶¶ 98, 103).  The NDAs further provide that "Confidential Information" or "Confidential Samples" shall not be disclosed to any third parties for a period of five years, and that any testing performed on Confidential Samples must be immediately disclosed to the other party. (Compl. Ex. A, B at Sec. 3-5).  Confidential Samples must be designated as such, in writing, at the time of delivery.  (*Id.* at Sec. 4).  The parties may share Confidential Information with their affiliates, which include any corporation or

other business entity that controls, is controlled by, or is under common control with the party.  (*Id.* at Sec. 8).

The NDAs each contain an "Entireties" clause, which states that the agreement "contains the entire understanding of the parties pertaining to the Purpose and shall be amended only in writing agreed to by both parties." (Compl. Ex. A, B at Sec. 15).  The "Purpose" in the First NDA is defined as a "business opportunity of mutual interest" relating to "graphics products, and markets/manufacturing processes therefor, which discussions may include the disclosure of confidential information and/or samples solely for evaluation." (Compl. Ex. A).  The "Purpose" in the Second NDA is defined as exploring a business opportunity of mutual interest related to graphics products.  (Compl. Ex. B).

### 2.  Applicable Law

Under Singapore law, which governs the NDAs, the elements of a cause of action for breach of contract are (i) "the existence of a contract or agreement"; (ii) "the defendant's breach of the contract or agreement"; and (iii) "damages resulting from the breach."  *MM Global Servs., Inc.* v. *Dow Chem. Co.*, 283 F. Supp. 2d 689, 702 (D. Conn. 2003) (citation omitted).  (*See also* Compl. Ex. A, B).

### 3.  Application

As the parties do not dispute the NDAs' validity, the salient issue is whether DuPont breached the NDAs.  It did not.  In this regard, Big Vision raises several arguments, in something of a rhetorical sleight of hand, in order

47

to distract from the fact that it never actually designated its information as Confidential.  First, Big Vision submits that it did designate two e-mails as Confidential, albeit belatedly.  Second, Big Vision protests that the terms of the agreement were too onerous, and did not reflect the actual intentions of the parties.  Third, Big Vision argues — for the first time in its opposition papers — that the parties orally modified the contract; even then, it does not specify how, but only claims that DuPont breached it.  All three arguments fail.

### a.   Big Vision Never Designated Its Alleged Trade Secret as Confidential

It is undisputed that no information exchanged at the First Trial — or at any of the Davis-Standard Trials — was contemporaneously designated as Confidential in writing by Big Vision.  (Def. 56.1 ¶ 98).  Even if the information had been contemporaneously designated as Confidential orally or visually (and there is no evidence of that fact), Big Vision was still required to follow up in writing to confirm the designation within 30 days.  It did not.[32]  As such, any information disclosed at the First Trial was not designated as Confidential by Big Vision, and is thus not subject to protection under the NDAs.[33]

---

[32]   Big Vision's failure to designate as Confidential anything disclosed at the First Trial is particularly noteworthy because Big Vision claims that it disclosed its claimed trade secret to DuPont at the First Trial.  *See* Discussion Sec. C(2)(a)(i), *infra*.

[33]   Shailesh Visaria recalled at his deposition that on April 14, 2008, he told Mark Jacobson of DuPont's P&IP division that "if [DuPont] wanted to attend [Big Vision's] trial, [DuPont] need[ed] to ensure all confidentiality about [Big Vision's] trials and information about our developments." (S. Visaria Tr. 314).  Big Vision takes this testimony to mean that an oral confidentiality agreement was reached prior to the First Trial, which DuPont disputes.  (Pl. 56.1 ¶ 156; Def. 56.1 Response ¶ 156).  Even had such an oral agreement been reached prior to the First Trial, Big Vision concedes that the NDAs "merely memorialized a confidential relationship that existed since the parties' introduction." (Pl. Opp. 19 n.11).  Presumably for this reason, Big Vision's breach of contract argument (as well as its related unfair competition argument) has been

Big Vision ultimately rests its breach of contract claim on two e-mails that contain the word "confidential." (Pl. Opp. 8-10). Both were sent by Shailesh Visaria to various DuPont employees in July 2008 and July 2009, after the Second and Third Trials, respectively. (Pl. 56.1 Response ¶ 98). The first, a July 25, 2008 e-mail from Visaria to four DuPont employees, contained a confidentiality footer stating, in relevant part, "[t]his message (including any attachments) is privileged, confidential, and intended only for the use of the individual or entity to whom it is addressed." (Ex. 136; Def. 56.1 ¶ 98; Pl. 56.1 Response ¶ 98). The e-mail contained information about Big Vision's subsequent printing test on a sample produced at the First Trial, the problems with Entira from the First Trial, and brief references to the next trial. (Ex. 136). Without elaborating further, Plaintiff argues that this e-mail served as a confidentiality designation for all of "its confidential information." (Pl. Opp. 8).[34]

---

predicated on the written NDAs, and not any pre-existing oral understanding between the parties. (*See, e.g.*, *id.* at 8, 12). Indeed, even if Plaintiff's reference to this testimony were an attempt to assert a claim for breach of oral contract, it is inappropriate to raise new claims in opposition to a summary judgment motion, and as such, the Court need not consider such an argument. *See* Discussion Sec. B(3)(b), *infra*; *see also Southwick Clothing LLC* v. *GFT (USA) Corp.*, No. 99 Civ. 10542 (GBD), 2004 WL 2914093, at *6-7 (S.D.N.Y. Dec. 15, 2004) (refusing to consider claims regarding the existence of other oral or written agreements raised for the first time in opposition to summary judgment, and holding that "[a] complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered" (internal citations omitted)).

[34]   Indeed, Big Vision's use of this footer indicates, as DuPont suggests, that Big Vision understood that a written designation was required in at least some instances. *See Convolve, Inc.* v. *Compaq Computer Corp.*, 527 F. App'x 910, 924 (Fed. Cir. 2013) ("By acknowledging that the disclosures at the October 1998 meeting were confidential, the parties' conduct demonstrates they understood that oral and visual disclosures indeed require such follow up."). (*See* Def. Reply 2 n.3).

49

Big Vision's argument falls short.  For starters, to the extent that this footer was intended to serve as a designation of confidentiality, it failed to comply with the terms (including the time limits) set forth in the NDAs.  Perhaps more importantly, however, Big Vision had previously disclosed this same information — in greater detail — in e-mails dated June 19, 27, and July 10, 2008, all of which were sent without including a confidentiality designation.  (Ex. 136, 225).  The NDAs require written information to be contemporaneously designated as Confidential to qualify as such; because this information was already disclosed, it could not be designated as Confidential.  (Compl. Ex. A, B).

The second e-mail was sent to certain NOW employees on July 7, 2009, following the close of all three trials.  (Ex. 62, 138, 139).  In the course of discussing Big Vision's coating capabilities (and not, it should be noted, its intended banner formulation), Visaria wrote, "[n]eedless to say all the information we share on our product in all our communication[s] needs to [be] dealt with [the] utmost confidentiality."  (Ex. 62, 138, 139).  But merely writing that "all our communications" must be "dealt with … confidential[ly]" did not satisfy the clearly-worded requirements of the NDAs.  This e-mail was simply too late to cover any of the information disclosed at any of the trials.  These e-mails do not constitute confidentiality designations under the terms of the NDAs.

Visaria opined, in his capacity as Big Vision's witness designated pursuant to Federal Rule of Civil Procedure 30(b)(6), that it was unrealistic for the parties to include confidentiality designations on each e-mail, and that "as

a thumb rule … I think people understand that when you've enter[ed] into a confidentiality [agreement], information remains confidential." (S. Visaria 30(b)(6) Tr. 33). Beyond the self-evident proposition that Visaria's personal opinion cannot supplant the expressed mutual intent of the parties in the NDAs, his understanding of the NDAs would, if adopted, render its confidentiality provision a nullity.[35]

There is no evidence that the terms of the NDAs were so onerous as to be infeasible; each contains the simple requirement that information must be designated as Confidential before it will be treated as such. (Compl. Ex. A, B). If Big Vision believed the confidentiality designations in the NDAs were too burdensome, it was free to negotiate different terms. Big Vision cannot expect to engage in three trials — during which much of the information was provided by third parties and *none* of the information was contemporaneously designated as Confidential — and then succeed on a breach of contract claim based upon a belated, one-sentence, boilerplate confidentiality designation and an even-more-belated, one-sentence, catch-all confidentiality designation. If

---

[35]    Plaintiff alleges, and DuPont disputes, that Visaria "made clear to five different DuPont employees that all information Big Vision disclosed to DuPont concerning its recyclable banner project was confidential under the [NDAs]," and as a result, Visaria "received assurances that the information would be held in confidence." (Pl. Opp. 11). Even taking this hotly disputed testimony to be true, Plaintiff's allegation only establishes that certain DuPont employees agreed that information would be held "in confidence," which is very different from DuPont as a whole agreeing that all of Big Vision's information would be designated as Confidential under the NDAs.

Quite simply, the fact that a few DuPont employees — who were uninvolved in any of the Trials and largely ignorant of the NDAs — thought that Big Vision's information was confidential did not discharge Big Vision of the confidentiality designation requirement set out in the NDAs. (*See* Pl. Opp. 6; *see generally* Background Sec. A(8), *supra*; Def. 56.1 Response ¶ 211; Vyas Tr. 274-78). Moreover, to the extent this argument relates to Plaintiff's modification theory, the Court disregards such a belated claim. *See* Discussion Sec. B(3)(b) *infra*.

the alleged trade secret were as valuable and novel as Big Vision now claims, it should have gone to the trouble of designating its alleged trade secret as Confidential in its entirety.[36]

> ### b.   The Court Will Not Consider Big Vision's Belated Modification Theory

Plaintiff argues in the alternative that even if it did not properly designate its alleged trade secret as Confidential, the NDAs were modified orally or through the parties' course of conduct.  (*See* Pl. Opp. 9-11).[37]   Such an argument runs headlong into the text of the NDAs, which quite clearly prohibit oral modification except upon written agreement by both parties.  (Compl. Ex. A, B).

Defendant correctly notes that the Court need not consider this claim, because it was raised for the first time in Plaintiff's opposition papers.  (Def. Reply 2-3).  "Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that 'it is inappropriate to raise new claims for the first time in

---

[36]   There is no evidence in the record (other than counsel's conclusory assertion at oral argument, which of course is not evidence) that the banner sample Big Vision sent to NOW in 2009 was designated as a Confidential Sample.  (Nov. 5 Tr. 26).  Thus, DuPont's failure to disclose any internal tests on the banner sample did not constitute a breach of the NDAs.

[37]   Plaintiff protests that accepting Defendant's argument means that "nothing is protected under the [NDAs] … because neither party complied with the formal procedures for designating information as confidential."  (Pl. Opp. 8).  In support, Plaintiff cites the fact that DuPont did not designate any information as confidential in writing, and reasons from this that DuPont, too, meant to modify the contract orally.  (*Id.* at 11).  However, numerous DuPont employees testified that they did not disclose any confidential information at the trials (including, for instance, the precise formula of Entira), and that anything they did disclose was publicly known.  (Def. 56.1 Response ¶¶ 177, 178).  Thus, their failure to designate such information as Confidential is unsurprising: they did not consider it to be such.

52

submissions in opposition to summary judgment.'" *Price* v. *Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 686 (S.D.N.Y. 2011) (internal citation omitted); *Maharishi Hardy Blechman Ltd.* v. *Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 544 (S.D.N.Y. 2003) ("A summary judgment opposition brief is not a substitute for a timely motion to amend the complaint."). A claim for oral modification would require separate discovery and argument, and would of necessity result in prejudice to DuPont. For all of these reasons, the Court will not consider this newly-added claim.[38]

The Court takes note, however, that the Federal Circuit recently considered a similar fact pattern in *Convolve*, cited *supra*. There, the plaintiff had failed properly to designate information as confidential under the terms of a similar NDA. However, the plaintiff argued that the parties had, through their course of conduct, "adopted a broad construction of the NDAs or waived their specific requirements for designating matters as confidential." 527 F. App'x at 921. The court held that plaintiff had failed to designate its information as confidential under the "unambiguous" terms of the NDA, and that in the face of a provision prohibiting oral modification, Plaintiff's argument would render the contract "a dead letter." *Id.* at 923. The court went on to affirm the district court's finding that plaintiff's employee's subjective belief

---

[38]   Though the Court need not reach this issue, it appears that the argument would also fail on the merits, because Plaintiff has not alleged precisely how, or even when, the contract was modified (as distinguished from what provision was modified), or whether the parties agreed it should be modified. (*See* Pl. Opp. 10-11 (arguing, without more, that the parties "reached consensus to modify the [NDAs'] designation procedures")). In particular, as DuPont notes, there is no evidence of a "consensus" or meeting of the minds under Singapore law, which is required for oral modification of a written contract. (*See* Def. Reply 3 n.5).

that "all disclosures were confidential" was not indicative of the mutual intent of both parties.  *Id.* at 924.

Similarly, Big Vision failed to designate any information as Confidential, rendering irrelevant whatever subjective belief it may have held regarding the confidentiality of that information.  Because Plaintiff did not designate any materials exchanged in the Davis-Standard trials as Confidential, if DuPont used any information it learned in the trials, it cannot constitute a breach of contract.  Summary judgment is accordingly granted to DuPont on Big Vision's breach of contract claim.

## C.    Defendant Is Entitled to Summary Judgment on Plaintiff's Trade Secret Misappropriation Claim

Big Vision's second claim, for trade secret misappropriation, fares no better.  The gravamen of the claim is that DuPont, representing itself as a "mere resin supplier" at the three Davis-Standard Trials, used those trials to gain access to Big Vision's trade secret method for producing recyclable banners and then misappropriated that information for DuPont's own gain. (Pl. Opp. 5-6).  This claim fails for at least three reasons.  First, Big Vision failed to describe its trade secret with particularity, both at the time of disclosure and throughout the instant litigation.  Second, to the extent discernible, Big Vision does not have a trade secret because the information was not secret and was publicly known.  Third, DuPont did not use the trade secret or discover it by improper means.

### 1.      Applicable Law

A "trade secret is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.'" *Softel, Inc.* v. *Dragon Med. & Scientific Comms., Inc.*, 118 F.3d 955, 968 (2d Cir. 1997) (quoting RESTATEMENT (FIRST) OF TORTS § 757 cmt. b (1939)). To succeed on a claim for misappropriation of trade secrets under New York law, a plaintiff must demonstrate that (i) "it possessed a trade secret," and (ii) the defendant "used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *N. Atl. Instruments, Inc.* v. *Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999) (internal citation omitted).[39]

Before analyzing whether Plaintiff had a trade secret, the Court first considers whether Plaintiff has described its trade secret with sufficient particularity, both at the time of disclosure and throughout the litigation.  *See Heyman* v. *AR. Winarick, Inc.*, 325 F.2d 584, 588-90 (2d Cir. 1963); *Sit-Up Ltd.* v. *IAC/InterActiveCorp.*, No. 05 Civ. 9292 (DLC), 2008 WL 463884, at *10-12 (S.D.N.Y. Feb. 20, 2008).

---

[39]     Neither party has addressed whether New York or Singapore law applies to Big Vision's trade secret misappropriation or unfair competition claims, but both parties submitted briefing applying New York law.  While the NDAs state that Singapore law governs the interpretation of those agreements, New York courts have consistently held that similar choice-of-law provisions were too narrow to cover non-contractual claims.  *See Innovative BioDefense, Inc.* v. *VSP Technologies, Inc.*, No. 12 Civ. 3710 (ER), 2013 WL 3389008, at *4-5 (S.D.N.Y. July 3, 2013) (collecting cases).  For this reason, the Court applies New York law to Big Vision's non-contractual claims.

2.    **Application**

    a.    **Big Vision Has Not Described Its Alleged Trade Secret with Particularity**

        i.    **The Law on Particularity**

The requirement of particularity exists for the simple reason that a defendant must know what constitutes a plaintiff's trade secret, so that it does not infringe upon that trade secret and so that the defendant can defend itself at any trial. *See Sit-Up Ltd.*, 2008 WL 463884, at *10-11. Two cases in this Circuit are instructive on this requirement.

In *Heyman*, 325 F.2d at 586-90, the Second Circuit held that the plaintiff's reference to his trade secret as a "quaternary" (i.e., a non-toxic surface agent) at the time of disclosure was so "vague and indefinite" that it was not entitled to protection under the law of trade secrets. *Id.* at 590. In that case, the plaintiff had developed an at-home fingernail-hardening solution, and sought to sell his business; the defendants approached the plaintiff with interest in purchasing his business. *Id.* at 586. Over the course of several meetings, the plaintiff described his nail-hardening solution as "a quaternary, and that initially it was toxic, and [plaintiff] discovered the substitute, the non-toxic surface agent." *Id.* at 591. In ruling that the phrase "quaternary" was not entitled to protection as a trade secret, the Court held that had the plaintiff "disclosed the actual formula for his product, or if he had informed defendants with more particularity of its ingredients, there would have been a disclosure of a trade secret." *Id.* at 590.

56

In *Sit-Up Ltd.*, Judge Cote built on *Heyman* in holding that specificity was required not only at the moment of disclosure of the trade secret, but also throughout the litigation.  2008 WL 463884, at *11-12.  The plaintiff in that case had revealed certain business information under the protection of a non-disclosure agreement, which prohibited the use of that information for any purpose other than evaluating the plaintiff's business for an acquisition.  *Id.* at *1-2.  The plaintiff claimed that the defendants had misappropriated its alleged trade secrets, which the plaintiff then struggled to define over the course of the litigation.  *Id.* at *1, 8-9.  The court found that the defendant had breached the non-disclosure agreement by using certain of plaintiff's information, but that the plaintiff had failed to define a number of its trade secrets with sufficient particularity.  *Id.* at *11-12, 21-22.

Judge Cote explained why her decision was a natural outgrowth from the Second Circuit's holding in *Heyman*:

> A corollary requirement of specificity for claimed trade secrets is inferable from this holding: If a particular piece of information, or a formula, is not entitled to trade secret protection because it is "so vague and indefinite" at the time it is divulged, then it cannot be granted protection as a trade secret by a court during litigation if it is "vague and indefinite." Specificity is required at the moment of divulging so that the party to whom the secret is revealed understands the contours of the secret information and does not inadvertently or purposefully transgress its boundaries. Similarly, specificity is required before the court so that the defendant can defend himself adequately against claims of trade secret misappropriation, and can divine the line between secret and non-secret information, and so that a jury can render a verdict based on a discriminating analysis of the evidence of disclosure and misappropriation.

2008 WL 463884, at *11-12.

While the Second Circuit has not explicitly adopted this requirement,[40] each Circuit Court of Appeals to have opined on this issue has required a comparable degree of specificity, as have numerous district courts across the country.  *See Sit-Up*, 2008 WL 463884, at *11 (citing *IPX Sys. Corp.* v. *Epic Systems Corp.*, 285 F.3d 581, 583 (7th Cir. 2002), and *MAI Systems Corp.* v. *Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993)); *see also Triple Tee Golf, Inc.* v. *Nike, Inc.*, 485 F.3d 253, 265 (5th Cir. 2007) (noting that appellants did not challenge district court's ruling compelling them to define their trade secret with specificity); *SL Montevideo Tech., Inc.* v. *Eaton Aerospace, LLC*, 491 F.3d 350, 354 (8th Cir. 2007) ("[s]imply to assert [that] a trade secret resides in some combination of otherwise known data is not sufficient, as the combination itself must be delineated with some particularity in establishing its trade secret status" (internal citation omitted)); *see also, e.g., Dow Chem. Canada, Inc.* v. *HRD Corp.*, 909 F. Supp. 2d 340, 346 (D. Del. 2012) (a plaintiff must identify its trade secrets "with a reasonable degree of precision and specificity" that is "particular enough as to separate the trade secret from matters of general knowledge in the trade or of special knowledge of persons skilled in the trade." (internal citation omitted)); *L-3 Comms. Corp.* v. *Jaxon*

---

[40]    The Second Circuit has, however, affirmed at least one district court opinion that required specificity for the putative trade secret in the litigation.  *See Julie Research Labs., Inc.* v. *Select Photographic Eng'g, Inc.*, 998 F.2d 65, 66 (2d Cir. 1993) (per curiam); *see also Vermont Microsystems, Inc.* v. *Autodesk, Inc.*, 88 F.3d 142, 147 (2d Cir. 1996) (applying California law, which requires that the plaintiff "identify the trade secret with reasonable particularity" (citing Cal. Civ. Proc. Code § 2019(d), which requires, in any action alleging misappropriation of trade secret, that before commencing discovery, a party alleging misappropriation must identify trade secret with reasonable particularity)).

*Eng'g & Maint., Inc.*, No. 10 Civ. 2868, 2011 WL 10858409, at *2 (D. Colo. Oct. 12, 2011) ("[W]hat is clear is that general allegations and generic references to products or information are insufficient to satisfy the reasonable particularity standard."); *Hill* v. *Best Medical Int'l, Inc.*, No. 09 Civ. 1194, 2010 WL 2546023, at *4 (W.D. Pa. June 24, 2010) (holding that "general allegations and generic references to products [were] insufficient to satisfy [the party's] burden of identifying its misappropriated trade secrets with 'reasonable particularity,' especially in light of the extensive discovery that [it] ha[d] obtained" (internal citations omitted)); *Knights Armament Co.* v. *Optical Sys. Tech., Inc.*, 254 F.R.D. 463, 467 (M.D. Fla. 2008) ("It is axiomatic that a party may not assert a cause of action for misappropriation of trade secrets without identifying for the opposing party the trade secrets at issue.... [I]t is insufficient to describe the trade secrets by generic category.... Rather, [the plaintiff] must identify the specific characteristics of each trade secret, such as a particular drawing, process, procedure or cost/pricing data." (internal citations omitted)).

Several district courts within this Circuit have adopted this particularity requirement, and this Court now joins them.  *See, e.g.*, *TNS Media Research, LLC* v. *TRA Global, Inc.*, No. 11 Civ. 4039 (SAS), 2013 WL 5502815, at *24 (S.D.N.Y. Oct. 3, 2013) (dismissing trade secret claim for failure to define it with particularity during the litigation); *Sarkissian Mason, Inc.* v. *Enter. Holdings, Inc.*, No. 11 Civ. 9472 (LGS), 2013 WL 3585313, at *7 (S.D.N.Y. July 15, 2013) (applying Missouri law, and holding that "the Court cannot find a trade secret, because it is insufficiently defined.... General categories of

information are insufficiently specific to qualify as trade secrets." (internal citations omitted)); *Dorset Indus., Inc.* v. *Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 412 (E.D.N.Y. 2012) (citing the analysis utilized in *Sit-Up* and finding that plaintiff had defined its trade secret with sufficient particularity to survive a motion to dismiss); *Waterville Inv., Inc.* v. *Homeland Sec. Network, Inc. (NV Corp.)*, No. 08 Civ. 3433 (JFB), 2010 WL 2695287, at *4-5 (E.D.N.Y. July 2, 2010) (finding that the plaintiff had failed to state a claim for trade secret misappropriation where the plaintiff had not demonstrated that its process was unique, and where there was no evidence that plaintiff gave a description of the process, rather than a finished product displaying the results of that process, to defendants).

### ii.   The Trade Secret Was Not Described With Particularity at the Time of Disclosure

Big Vision alleges that it came to the Davis-Standard trials with a fully formed, five-element trade secret that was memorialized for the first time in the trial plan drafted by Davis-Standard in May 2008.  (Nov. 5 Tr. 16-18).[41]  Even if the Court were to accept this allegation as true, the undisputed facts show that Big Vision made virtually no effort to identify its alleged trade secret with particularity at the time of disclosure, and did nothing to separate its alleged

---

[41]   Big Vision does not suggest that its pre-Trials development efforts reflect its five-element trade secret.  For example, Big Vision does not claim, nor could it, that the film produced at Charu Plastics in 2007 represents its trade secret.  (*See* Def. 56.1 Response ¶ 145).

trade secret from DuPont's own contributions to the trial or the latter company's considerable prior knowledge.[42]

In particular, Big Vision contends that its trade secret was disclosed to DuPont at the First Trial in June 2008, through the Trial Plan and Run Reports.[43]  Significantly, however, these documents do not actually disclose the trade secret with *any* degree of particularity, much less the particularity required by law.  Divining what was tested at the First Trial alone requires cross-referencing at least four separate sources.  *See* n.19, *supra*.  Compared to divining which structures or ideas constituted Big Vision's trade secret, however, that exercise was easy.

It is undisputed that the formulas for each sample tested at the First Trial were markedly different: the concentrations of Entira varied, the layer

---

[42]    Between April and June 2008, Davis-Standard liaised with both DuPont and Big Vision to develop the trial plan for the First Trial, and DuPont provided suggestions regarding the composition of the structures to be tested.  *See* Background Section A(5)(a)(i), *supra*. While Big Vision may not have been aware of DuPont's involvement at this stage, the fact remains that when the trade secret was allegedly disclosed to DuPont, DuPont itself had been consulted regarding several aspects of it.  This further underscores why it was important for Big Vision not only to define its alleged trade secret with particularity, but also to define it with sufficient particularity to separate it from DuPont's pre-existing knowledge.

[43]    The Court focuses on the disclosure at the First Trial because that is when Plaintiff argues that it first disclosed its trade secret to DuPont and, more importantly, because, in Plaintiff's own words, the Second Trial was a "collaborative effort," and the Third Trial plan was drafted by DuPont.  *See* Background Sec. A(5)(b)-(c), *supra*.  Considering the "disclosures" made during the Second and Third Trials in the Court's analysis here would only further weaken Plaintiff's argument, because the structures tested in those Trials varied significantly from the structures tested at the First Trial, were not subject to any affirmative designation by Big Vision, and were in large part the product of DuPont's suggestions. *See generally id.*

DuPont asks the Court to find that if there was a trade secret, it was jointly developed, but in holding that there was no trade secret, the Court declines to reach this issue. (Def. Br. 24 (citing Raymond T. Nimmer & Jeff C. Dodd, MODERN LICENSING LAW § 17:9 ("if two or more parties jointly develop confidential information, both own the trade secret"))).

compositions varied, the additive amounts varied, the substrates varied, and the surface treatments varied. *See generally* Background Sec. A(5)(a), *supra*. Plaintiff acknowledges that not every structure tested at the First Trial reflected the five-element trade secret, but attempts to sidestep the issue by arguing that all of the structures tested there "embodied" the trade secret and were tested "in service of" the trade secret "concept." (Nov. 5 Tr. 19-20). This cannot stand. Absent an affirmative disclosure or description from Big Vision, DuPont had no way of knowing *which* structure or structures embodied Big Vision's trade secret. Was it the structure with 100% Entira coating (which Big Vision now disclaims), or the structures with no Entira coating? Which was "minimal": 0%, [redacted]%, [redacted]%, or 100% Entira? Which of the many substrates were "suitably strong"? And at what point or points did the concentrations of $CaCO_3$ and $TiO_2$ become "high" (even though the percentages were raised in subsequent trials, and even though they were dwarfed by the 25% disclosed in the 3M Patent)? More pointedly, if the structures tested "embodied" and were "in service of" the actual trade secret, how was DuPont to know what that *actual* trade secret was, absent a disclosure from Big Vision?

The legal point here is not complicated. In order to avail itself of trade secret protection, Big Vision must have, at the absolute minimum, notified DuPont of its trade secret. It need not have said the words "trade secret," or put forth the same degree of detail as would be appropriate in litigation, but it must have done *something*. Big Vision indisputably made no such disclosure at the First Trial. It did not inform anyone orally or in writing of its alleged

62

trade secret; it did not mark the Trial Plan, Trial Report, or Run Reports as confidential; and it did not designate anything that happened at any Trial as Confidential under the NDAs.  *See* Background Sec. A(5), *supra*.  Big Vision thus passively allowed nine very different formulations for recyclable banners to be "disclosed" by Davis-Standard by means of dozens of pages of undifferentiated, non-confidential machine printouts and Trial Plans, none of which was actually drafted by Big Vision.  Even now, Big Vision has not identified one structure tested at the First Trial that reflects all five elements of its purported trade secret.  Its disclosure was so "vague and indefinite" that, as a matter of law, DuPont could not have been on notice of Big Vision's alleged trade secret.

There was no written confidentiality agreement in place at the time of the First Trial, even though the parties had discussed such an agreement in April 2008.  Big Vision could have insisted that the NDA be signed prior to the First Trial.  It did not.  Big Vision could have negotiated for terms providing that all information disclosed by Big Vision constituted its confidential information, as did the plaintiff in *Sit-Up*.  It did not.  Big Vision could have negotiated for terms providing that every structure tested in the trials, including the First Trial, would constitute Big Vision's trade secret or confidential information.  It did not.  Big Vision could have followed up in writing, 30 days after the First Trial and after the NDA was signed, summarizing its alleged trade secret and designating it as confidential.  As with everything else, it did not.

The only thing Big Vision affirmatively did around the time of the First Trial — and this is the subject of considerable dispute and not-considerable corroboration — was tell one DuPont employee, who did not attend the Trials, that DuPont needed to "ensure all confidentiality about [Big Vision's] trials and ... developments." (S. Visaria Tr. 314). A unilateral declaration of confidentiality relating to an entire commercial field is so vague and indefinite that it could not have provided the requisite particularity that a sophisticated, knowledgeable company like DuPont would need to ascertain the limits of Big Vision's allegedly confidential information. To be sure, had Big Vision approached a layperson and stated "everything related to recyclable banners is confidential," the Court's analysis of whether it had disclosed its trade secret with particularity might be different. But DuPont had developed advertising banners for decades, held numerous patents in the space, and had at least two divisions in North America alone that were developing and testing these products. *See* Background Sec. A(4), (8), *supra.* "Specificity is especially important when a defendant holds a patent on the product.... It would substantially diminish the scope of patent protection to allow an award of damages for making and selling a product on which you have a patent, just because of vague overlaps between the patented product and another firm's technology." *Composite Marine Propellers, Inc.* v. *Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) (per curiam).

It would be absurd to allow Shailesh Visaria's disputed declaration of confidentiality — which was plainly ineffectual under the NDAs — to bar

virtually all development of recyclable banners by DuPont.  Adopting Big

Vision's argument would allow a party belatedly and unilaterally to declare

"everything we do is confidential," and thereby prevent another party who holds

patents in the same space (here, one of the world's largest chemical companies)

from doing anything that even hints at the wide variety of structures tested

over a thirteen-month period.  A contrary holding would create a perverse

incentive *not* to engage in collaborative trials or developments — particularly

where the parties had already contracted their relationship — since one party

could simply claim *ex post* that everything that occurred was its trade secret.

Big Vision uses "trade secret" and "confidential" as if the terms were

interchangeable, but they are not.  Most of Big Vision's witnesses subscribed to

the idea that everything that occurred during the trials constituted Big Vision's

trade secret.[44]  In fact, its counsel espoused that rather remarkable claim at

---

[44]   Big Vision attempts to cabin Visaria's testimony on this point by arguing that counsel
for DuPont was asking Visaria to reach legal conclusions. (Pl. Opp. 16).  Yet it remains
telling that the managing director of Big Vision, who was involved in every stage of its
recyclable banner project, and was put forth as Plaintiff's Rule 30(b)(6) witness, could
not define its alleged trade secret more than to say, in essence, that everything that
happened was Big Vision's confidential information.  When asked to identify Big
Vision's trade secret, Visaria testified: "[a]ll of our confidential information, including
trials, formulations, it's for our attorneys to identify trade secrets."  When asked if all of
the "information that [Big Vision] supplied with DuPont was [Big Vision's] trade secret,"
Visaria replied "[t]hat's correct. It was confidential, I said. And it's up to my attorneys to
decide which of them were trade secrets."  When asked again to identify the trade
secret, Visaria stated that it consisted of "[t]he use of nonwoven banners, nonwoven
fabric substrate structures, co-extrusion structures which are multilayer structures,
[and the] use of calcium carbonate."  Visaria stated that "[e]very trial that we made were
confidential, including downgauging which we — which we knew about it, and we put it
into practice at [the Davis-Standard] trials[....] And recyclability and even including
achieving printability on Entira."  Visaria went on to identify that both high and low
levels of $TiO_2$ constituted Big Vision's trade secret, the use of additives constituted Big
Vision's trade secret, and that "[i]t's for my attorneys to decide whether even use of
business model, of recycling loop.  They were confidential.  I leave it for my attorneys to
decide."  (S. Visaria 30(b)(6) Tr. 36-39).

65

oral argument.[45]  Significantly, however, Big Vision's belief in the confidentiality of its information, however fervent, does not transform that information into trade secrets.

At base, Big Vision is seeking retroactively to add terms to the NDA for which it failed to bargain in the first place.  The Court refuses to expand trade secret law to fill in the gaps created by Big Vision's own failure to negotiate and abide by the terms of the NDAs.  DuPont is entitled to summary judgment on Big Vision's trade secret misappropriation claim on this basis.

### iii. Virtually All of the Elements of the Trade Secret Were Described With Insufficient Particularity During Litigation

Perhaps because Big Vision did not define its trade secret with sufficient particularity at the time of disclosure, it has similarly struggled to define it with sufficient particularity throughout the litigation.  It does not require a chemistry degree to realize that the putative trade secret has differed meaningfully and materially throughout the litigation.  *See* Background Sec. B(2), *supra*.[46]

---

[45] When asked at oral argument whether everything in the Run Reports was Big Vision's trade secret, Plaintiff's counsel replied "Yes.[...] Everything." (Nov. 5 Tr. 28).  Counsel later clarified "[t]he fact of Entira is not [Big Vision's] trade secret.... But the formulations that are expressed in the run reports are expressions of the five elements of the strong nonwoven banner, of the minimal use of Entira, and the other elements, the coating and so forth."  (*Id.*).  In connection with this motion, however, Big Vision simultaneously disclaims the all-Entira structure tested at the First Trial (*id.* at 20; Pl. 56.1¶ 159), and claims that all structures tested at all Trials constituted its trade secret (Nov. 5 Tr. 19-20).

[46] Plaintiff's expert only adds to the lack of clarity.  Dr. Reitman opines that when Big Vision's five-element trade secret is "used as essentially taught, you should be getting products with" the following attributes: "a light weight, recyclable wide format structure with a desirable combination of printability with both UV and solvent-based inks, aesthetics, cost, and durability."  (Def. 56.1 ¶ 40; Pl. 56.1 Response ¶ 40).  The

Even now, the putative trade secret is notable for its imprecision.  *See BondPro Corp.* v. *Siemens Power Generation, Inc.*, 463 F.3d 702, 710 (7th Cir. 2006) ("One expects a trade secret to be rich in detail, because a process described in general terms [...] will usually be widely known and thus not worth incurring costs to try to conceal and so not a trade secret." (internal citations omitted)).  For example, when pressed on the meaning of vague terms like "minimal," "predominantly," and "expensive," Plaintiff refers back to the Run Reports and Trial Plans.  (*See, e.g.*, Pl. 56.1 Response ¶ 25).  As previously noted, those documents are hardly illuminating.  More importantly, by taking this position, Big Vision impermissibly shifts its burden onto DuPont (and the Court) to sift through 70 pages of abstruse laboratory papers to ascertain Big Vision's trade secret.[47]

---

attributes are essentially a "wish list" and do not impart sufficient particularity to put DuPont on notice as to the trade secret; moreover, they were asserted for the first time in Plaintiff's expert report.  In any event, Big Vision has not alleged, nor could it, that all recyclable banners with these subjective attributes reflect misappropriation of its trade secret.

[47]   The only time Big Vision attempted to define the elements of its claimed trade secret was at its expert's deposition, after substantial questioning by DuPont.  Even then, the definitions were impermissibly vague and circular: (i) when asked if "predominantly" means "more than 50 percent," Dr. Reitman answered, "that would be one way of thinking about it" (Reitman Tr. 154-55); (ii) when asked what "unconventionally high pigment levels" are, Dr. Reitman responded, "conventional levels are well below what is reflected in [the Trials]" (*id.* at 126); (iii) to Dr. Reitman, "suitably strong" means "[t]here is a general expectation associated with the market in terms of the strength and tear resistance that will enable the use for these end use applications" (*id.* at 148); and (iv) to Dr. Reitman, "minimal use of expensive resins" means "the composition should be predominantly polyethylene and should be formulated in a way to minimize cost without compromising the functionality for this market" (*id.* at 159).

In a last-ditch effort to shore up the definition it has put forth, Big Vision points to Dr. Reitman's opinion that the trade secret was defined in a level of particularity "that people in my field would recognize as being scientifically accurate and informative."  (Pl. Opp. 16; Pl. 56.1 Response ¶ 38).  This effort fails.  To the extent Dr. Reitman proffers a legal opinion regarding the sufficiency of the trade secret definition put forth, the Court disregards that portion of her opinion.

Numerous district courts facing this situation, i.e., a plaintiff unwilling or unable to winnow its trade secret from dozens of pages of materials, have required the plaintiff to define its trade secret without referring to those materials.  In *IDX Systems Corp.* v. *Epic Systems Corp.*, the Seventh Circuit rebuffed the plaintiff's "tender of the complete documentation for the software" because it did not identify "exactly which pieces of information are the trade secrets." 285 F.3d 581, 584 (7th Cir. 2002).  In so holding, the panel wrote that a plaintiff "must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition."  *Id.* (internal citation omitted)).

In *TNS Media Research*, cited *supra*, the court held that the plaintiffs could not "reserve[] the 'right to rely upon additional documents or testimony related to each trade secret'" among the hundreds of pages it claimed represented its trade secret.  2013 WL 6170643, at *24.  Incorporating language from *Sit-Up*, that court held that the plaintiff's "'Dance of the Seven Veils approach to [its] trade secret claim' [was] manifestly prejudicial to the [Defendants], and taxing on the Court."  *Id.*; *see also Imax Corp.* v. *Cinema Technologies, Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998) (finding that "reasonable specificity could only be achieved by identifying the precise numerical dimensions and tolerances as trade secrets").[48]

---

[48]   *See also Xerox Corp.* v. *Int'l Bus. Machines Corp.*, 64 F.R.D. 367, 371 (S.D.N.Y. 1974) (finding that the plaintiff had failed to specify the data forming the basis for its trade secret claim where "Xerox has not specified which information contained in, referred to by, or incorporated by reference in the documents listed by Xerox are considered by Xerox to be trade secrets or confidential information"); *Synygy, Inc.*, 2013 WL 3716518,

So too here.  There is a protective order in this case.  Big Vision had
every opportunity over the past two years, and was in fact repeatedly asked, to
disclose the precise formula for its trade secret.[49]  For whatever reason, it did
not.  The Run Reports and Trial Plans do not identify the trade secret with
particularity because of the wide variety of structures and at-times

---

at *5 (ordering Plaintiff to "include references to examples of specific documents that
include the specifically identified trade secrets" after the close of fact discovery")*;
Loparex, LLC* v. *MPI Release Technologies, LLC*, No. 09 Civ. 1411, 2011 WL 1135906, at
*5 (S.D. Ind. Mar. 25, 2011) (holding that in submitting 20 pages of formulas and
machine operating settings, rather than actually identifying specific formulas that were
its trade secrets, the plaintiff had "impermissibly attempted to shift to the Court
[plaintiff's] burden to sufficiently describe its trade secrets"); *Fast Food Gourmet, Inc.* v.
*Little Lady Foods, Inc.*, No. 05 Civ. 6022, 2007 WL 2156665, at *8-12 (N.D. Ill. July 26,
2007) (excluding information the plaintiff had sought to use regarding certain
components of its alleged trade secrets, and finding that the plaintiff had not
sufficiently disclosed those components during discovery, where, "[i]nstead of simply
identifying those components, [the plaintiff] provided a list of documents that were
claimed to contain the information that was sought"), *objections overruled in part and
sustained on other grounds*, No. 05 Civ. 6022, 2007 WL 3052944 (N.D. Ill. Oct. 18,
2007); *see generally* 3 Roger M. Milgrim, Milgrim on Trade Secrets § 14.02 (2011) ("it is
essentially necessary for a plaintiff to identify its trade secrets before the defendant
proceeds with disclosure of its confidential information"); *MSCI Inc.* v. *Jacob*, 945
N.Y.S.2d 863, 865-66 (Sup. Ct. 2012) ("Only by distinguishing between the general
knowledge in their field and their trade secrets, will the court be capable of setting the
parameters of discovery and will defendants be able to prepare their defense.[...]
Moreover, it would be unfair to allow plaintiffs to discover [defendant's] trade secrets
prior to revealing their own.").

In a facially contrary holding in *3M* v. *Pribyl*, the Seventh Circuit upheld a jury verdict
for a misappropriation of trade secret claim, and held that the trade secret was defined
with particularity where the 500-page manual plaintiff relied upon in defining its trade
secret alleged a singular process that was a protectable trade secret.  259 F.3d 587,
595-96 (7th Cir. 2001).  This case is factually inapposite.  Far from alleging a singular,
unified process, the Trial Plans and Run Reports include contrary ideas (100% Entira,
0% Entira) and varying structures, not all of which Big Vision claims reflect its trade
secret.

[49]   Big Vision argues that because DuPont's counsel wrote an e-mail describing the parties'
meet and confer as "productive," they are somehow estopped from asserting this
defense at summary judgment.  (Pl. 56.1 ¶ 220).  The Court is not swayed by this
argument.  DuPont tried repeatedly — in interrogatory requests, at conferences before
Magistrate Judge Katz, at a meet and confer, and even at oral argument on this
motion — to get Big Vision to define its trade secret with particularity.  *See* Background
Sec. B(2), *supra*.  What it received each time was a different, equally opaque description
that changed in response to the parties' discovery efforts.  This cannot constitute
particularity.

contradictory ideas tested.  They implicate varying structure compositions, a variety of different additives in differing concentrations, an enormous range of Entira amounts, and a wide variety of substrates and finishing treatments.  Put simply, the entire field of recyclable banners cannot be Plaintiff's trade secret.  For that reason, the Court must consider whether the description put forth by Big Vision during the litigation — without reference to the Trial Plans and Run Reports — identifies the trade secret with sufficient particularity.[50]

Taking the five elements in turn, the first is a "suitably strong polyolefin central layer."  The Court finds that the term "suitably strong" is subjective, not defined, and thus not specific.  Numerous substrates were tested at the trials, and Plaintiff has not identified whether it finds any of them to be "suitably strong."  However, the term "polyolefin central layer" is sufficiently particular.

Second, the phrase "high pigment levels" is vague and indefinite.  Big Vision tested a wide range of pigment levels at the trials, most of which were well within the normal range for the industry or disclosed in the patent literature.  *See* nn.4, 5, 7, and 11, *supra*.  Without identifying which pigment

---

[50]   In response to DuPont's particularity argument, Big Vision improbably points to *Sit-Up* in arguing that it need not define its trade secret with particularity since it seeks protection for its "'unique manner of combining certain pieces of public information into a commercially advantageous business model.'"  (Pl. Opp. 16 (citing *Sit-Up Ltd.*, 2008 WL 463884, at *10-11)).  Setting aside the fact that Big Vision does not seek protection for its "business model," but rather its formula for producing banners, Judge Cote considered and rejected precisely this same argument in *Sit-Up*, holding that "[w]hether something is protectable, and whether someone is deserving of protection, are two entirely different questions.  New York and Second Circuit law establish that compilation trade secrets are protectable but, as discussed above, the law requires the trade secret claimant to describe the secret with sufficient specificity that its protectability can be assessed and to show that its compilation is unique."  *Sit-Up Ltd.*, 2008 WL 463884, at *10-11.

70

levels were high, or in relation to what marker the pigment levels could be considered "high," this phrase is not sufficiently particular.

Third, the phrase "a layered structure efficiently made by coextrusion or lamination of a predominantly LDPE structure" is not sufficiently particular. "Predominantly" is not defined and is vague. Again, since a wide variety of structures and composition of LDPE were tested at the trials, "predominantly" is not sufficiently particular.[51] The phrase "layered structure efficiently made by coextrusion or lamination" is sufficiently particular, save to note that no structure at the Davis-Standard trials was made by lamination. (*See* Ex. 75, 76, 77, 78).

Fourth, the phase "minimal use of Entira or other expensive resins" is not sufficiently particular because "minimal" and "expensive" are subjective and not defined.[52] At the First Trial alone, the percentage of Entira used varied

---

[51]   Big Vision claims that DuPont should have known that its trade secret encompassed "predominantly" LDPE structures because some, but not all, structures at the First and Second Trials used LDPE but not Entira. (Pl. Opp. 17; Pl. 56.1 Response ¶¶ 128-29). At the First Trial, Entira was used in concentrations of [redacted]-100%; it is difficult to imagine how DuPont could be expected to ascertain what "predominantly" LDPE, or even "minimal expensive resins," meant from that fact.

[52]   Big Vision alleges that "minimal" means both "some" and "no" Entira, and that its contribution to the recyclable banner industry was the determination "how to make cost-effective banners that require only the smallest amount of ethylene acrylic resin." (Pl. 56.1 Response ¶ 18; Compl. ¶ 21; Nov. 5 Tr. 21). Big Vision clarified for the first time in its expert report that the trade secret can be expressed through "two parallel concepts," namely the use of Entira and LDPE, or LDPE or LLDPE alone. (Pl. 56.1 Response ¶ 26). At oral argument, Big Vision claimed that its Third Interrogatory Response had noted that the trade secret could be expressed by replacing Entira completely with LDPE (Nov. 5 Tr. 21, 53), but DuPont correctly noted that the portion of the interrogatory response claiming the use of LDPE (paragraph 1) was subsequently disclaimed by Big Vision as not being part of its trade secret (*id.* at 53-54; Ex. 16, 104).

More troublingly, it appears that the first time that DuPont learned that Big Vision was claiming these "parallel expressions" of its trade secret was in Plaintiff's opposition papers. (Nov. 5 Tr. 54). Big Vision countered at oral argument that its Third Interrogatory Response had also disclosed an LDPE-only structure by means of the

from 0-100%, with most structures using [redacted]-[redacted]% Entira. Putting aside the fact that the word "minimal" is hopelessly vague, DuPont had no way to intuit Big Vision's trade secret from the voluminous Run Reports and Trial Plans.  Big Vision could have imparted a modicum of precision to the term "minimal."

Finally, "surface treatment" is sufficiently particular since it was defined with the use of several examples, including E-beam or corona treatment. In this litigation and in this motion, Big Vision has unwittingly demonstrated why the particularity requirement exists in the first place.  At the beginning of the litigation, it appeared that its trade secret was downgauging Entira with LDPE; to that end, considerable discovery was devoted to this assertion.  Big Vision then clarified that it did not claim "downgauging" as its trade secret; using small amounts of Entira (without defining the actual amounts) was its trade secret.  Then, at the eleventh hour and after fact discovery had closed, Big Vision redefined the word "minimal" to mean simultaneously "some" and "none," and claimed that its "innovation" was essentially to replace Entira with LDPE.  DuPont has tried to play "whack-a-mole" as best it can with Big Vision's

---

phrase "corona treatment could be used to contribute polar functionality to a banner surface composed of nonpolar polyolefins." (*Id.* at 56; Ex. 16).  It is worth noting that LDPE is named as such elsewhere in that Interrogatory Response (indeed, even in that same paragraph), when claiming that the trade secret involves the use of Entira *with* LDPE.  (Ex. 16).  This issue is exemplary of Big Vision's failure to describe its trade secret with particularity.

Even if Big Vision did disclose the use of LDPE in its interrogatory response, it has now singled out that reference from six pages of information, most of which it now disavows as its trade secret.  Once again, this confusion is unacceptable and could have been easily avoided had Big Vision defined its trade secret with particularity throughout the litigation.

shifting trade secret claims, but it need not have.  Big Vision was in the position — from the very beginning — to know the precise formula for its trade secret.  It should not have put the parties through this needless, expensive discovery effort because it could not decide what its trade secret really was.

Plaintiff has failed to identify all but one element of its five-element trade secret with sufficient particularity.  The definitions proffered throughout this litigation are not sufficiently particular, and thus Big Vision's claim fails for this reason as well.

### b.      Big Vision Does Not Have a Trade Secret

Even were the Court to find that Big Vision had defined its trade secret with sufficient particularity, its claim would fail because — to the extent the Court can discern the parameters of its trade secret claim from the instant record — what Big Vision has identified does not constitute a trade secret.

### i.      Applicable Law

"New York courts consider the following factors when determining whether certain information constitutes a trade secret: [i] the extent to which the information is known outside of the business; [ii] the extent to which it is known by employees and others involved in the business; [iii] the extent of measures taken by the business to guard the secrecy of the information; [iv] the value of the information to the business and its competitors; [v] the amount of effort or money expended by the business in developing the information; and [vi] the ease or difficulty with which the information could be properly acquired or duplicated by others." *USI Ins. Servs. LLC* v. *Miner*, 801 F.

Supp. 2d 175, 195 (S.D.N.Y. 2011) (citing *N. Atl. Instruments*, 188 F.3d at 44).

The most important factor is "whether or not the information is in fact secret."

*Derven* v. *PH Consulting, Inc.*, 427 F. Supp. 2d 360, 371 (S.D.N.Y. 2006) (citing

*Lehman* v. *Dow Jones & Co., Inc.*, 783 F.2d 285, 298 (2d Cir. 1986)).

The Court is mindful that the "'existence of a trade secret is a question of

fact.'" *Integrated Cash Mgmt. Servs., Inc.* v. *Digital Transactions, Inc.*, 920 F.2d

171, 174 (2d Cir. 1990) (quoting 1 MILGRIM ON TRADE SECRETS § 2.03, at 2-32 to

2-33 (1984)).  Yet in some situations, like here, whether or not information is a

trade secret "may be evident from the pleadings or the facts."  *Medinol Ltd.* v.

*Boston Scientific Corp.*, 346 F. Supp. 2d 575, 607 (S.D.N.Y. 2004); *see also*

*Bear, Stearns Funding, Inc.* v. *Interface Grp.-Nevada, Inc.*, 361 F. Supp. 2d 283,

305 (S.D.N.Y. 2005) (granting defendant's motion to dismiss trade secret

misappropriation claim); *Sarkissian Mason, Inc.*, 2013 WL 3585313, at *7-11

(granting defendant's summary judgment motion on trade secret

misappropriation claim).

### ii.    Application

#### (a)    The Information Is Not Secret

"Plaintiff must show that it took substantial measures to protect the

secret nature of its information."  *Geritrex Corp.* v. *Dermarite Indus., LLC*, 910

F. Supp. 955, 961 (S.D.N.Y. 1996) (internal citation omitted); *see also BondPro*

*Corp.* v. *Siemens Power Generation, Inc.*, 463 F.3d 702, 708 (7th Cir. 2006)

("What does forfeit protection is a failure to take reasonable steps to prevent

gratuitous disclosure.  Failure to take such steps is persuasive evidence that

the secret has no real value." (internal citations omitted)).  The undisputed facts demonstrate that Big Vision has not made such a showing.  Big Vision's alleged trade secret, to the extent it is discernible, is not secret because it was disclosed to over 16 different third parties and published by Visaria in a 2009 Indian patent application.

There is virtually no contemporaneous documentary or testimonial evidence — beyond the testimony of Visaria — indicating that Big Vision took any steps to ensure the confidentiality of the information it disclosed to third parties.  Instead, the evidence shows that Big Vision disclosed either the "recipe" it obtained from another company's patent, or variations of a formulation derived from structures tested at the First and Second Trials, to at least 16 different third parties.  Because Big Vision has not defined its trade secret with particularity, it is impossible to determine whether each third-party disclosure contained the alleged trade secret; it is worth noting, however, that while the information Visaria disclosed differed, it was represented each time to be Big Vision's intended recyclable banner formula.  (*See* Background Sec. A(3)(b), A(6), *supra*).

To be sure, as Plaintiff notes, the disclosure of allegedly secret information may still be considered secret if the recipient of that information is sworn to secrecy.  *See Speedry Chem. Products, Inc.* v. *Carter's Ink Co.*, 306 F.2d 328, 331 (2d Cir. 1962) (noting that while secrecy is not destroyed where others are "pledged" to secrecy, "a substantial, element of secrecy must exist,

so that, except by the use of improper means, there would be difficulty in acquiring the information").

As noted, Visaria testified to a universal understanding of confidentiality in the manufacturing business, and that he had verbal "communications to ensure confidentiality" with numerous third-party manufacturers.  (Pl. Opp. 19; Pl. 56.1 Response ¶ 115).  DuPont disputes this assertion, but neither party has presented any evidence corroborating or contradicting Visaria's *ipse dixit.*  And while the Court has resolved all ambiguities in Plaintiff's favor, Visaria's testimony is significantly undermined by the fact that he admits disclosing Big Vision's intended formula (in more detail and with more clarity than has been proffered in this litigation) to at least one manufacturer without any prior communications to "ensure confidentiality."  (*See* Ex. 68; S. Visaria Tr. 209-10).  In that instance, Visaria simply "sent [the formulation and machine specifications] to a [manufacturer's] website."  (S. Visaria Tr. 209).[53] Clearly, that recipient was not sworn to secrecy prior to Big Vision's disclosure. *See Speedry Chem. Products, Inc.*, 306 F.2d at 331.

The two cases Plaintiff cites in support of its argument are factually inapposite and do not involve such widespread disclosure of information.  In *A.*

---

[53]   Exhibits 69 and 71 contain identical e-mails from Visaria to two separate manufacturers, sent in the same month as the e-mail in Exhibit 68.  There is no indication that Visaria spoke to either manufacturer before sending these e-mails (*see* S. Visaria Tr. 210-11).

Visaria testified that although this e-mail adverted to the polymers and additives that Big Vision currently intends to use "in some combination," it only contained machine specifications.  (S. Visaria Tr. 211).  Plainly, however, the e-mail also includes the precise percentages and additives to be used in each layer of the banner.  (*See* Ex. 68, 69, 71).

*H. Emery Co.* v. *Marcan Products Corp.*, the Second Circuit affirmed a finding that the plaintiff's disclosure of parts drawings did not destroy secrecy, where that disclosure was of only a portion of the product and was made only to a limited number of customers and members of the trade.  389 F.2d 11, 16 (2d Cir. 1968).  In so holding, the Court emphasized that a "'substantial element of secrecy must exist' and this means so much that 'except by the use of improper means, there would be difficulty in acquiring the information'"; in that case, far from the plaintiff "freely disclos[ing]" its information to "all comers," the defendants actually had to resort to "subterfuge" in order to ascertain plaintiff's information.  *Id.* (citing RESTATEMENT (FIRST) OF TORTS § 757 (1939)).

Similarly, in *Trandes Corp.* v. *Guy F. Atkinson Co.*, the Fourth Circuit held that the plaintiff had taken reasonable measures to safeguard its secret where it had "licensed only two complete versions of [the trade secret] and extracted promises from both recipients that they would neither copy nor transfer the program, nor use the program for any purpose other than their own construction or engineering projects," and had implemented a password program to restrict unauthorized use.  996 F.2d 655, 664 (4th Cir. 1993).  That Court emphasized that the Plaintiff's limited disclosure to, at most, three outsiders, two of whom had licensed the product, did not destroy secrecy.  *Id.* By contrast, Big Vision disclosed its intended formulation to at least 16 separate third parties, without licensing the information, exacting written non-disclosure agreements, or even asking each one of them to maintain confidentiality.  Moreover, DuPont did not have to resort to subterfuge to

discover the information; it had only to accept an invitation to attend the

Trials.

Thus, even were there a "universal understanding" of confidentiality in

the machine manufacturing business, the sheer number of detailed disclosures

of ostensibly confidential information that Big Vision made — sometimes

without even contacting the third party first to ensure that the information

would be treated with confidentiality — distinguishes the instant case and puts

it in the realm of the extreme.  "If an individual discloses his trade secret to

others who are under no obligation to protect the confidentiality of the

information, or otherwise publicly discloses the secret, his property right is

extinguished."  *Ruckelshaus* v. *Monsanto Co.*, 467 U.S. 986, 1002 (1984)

(internal citation omitted).

Moreover, Big Vision's July 2009 Indian patent application destroyed any

secrecy that inhered in the alleged trade secret as of that date.  *See Timely*

*Products Corp.* v. *Arron,* 523 F.2d 288, 304 (2d Cir. 1975) ("The secret was

disclosed by [plaintiff] himself when his patent issued on December 20, 1966.

This cut off [plaintiff's] right to prevent use or disclosure by others, even

including [defendant]." (citing *Conmar Products Corp.* v. *Universal Slide*

*Fastener Co.*, 172 F.2d 150, 155 (2d Cir. 1949))); *see also BondPro Corp.* v.

*Siemens Power Generation, Inc.*, 463 F.3d 702, 706-07 (7th Cir. 2006)

("Publication in a patent destroys the trade secret, [...] because patents are

intended to be widely disclosed — that is the quid for the quo of the patentee's

exclusive right to make and sell the patented device.... Published patent

applications are in fact studied by inventors in the relevant field, and so a secret disclosed in them will ordinarily … lose its status as a trade secret." (citations omitted)).

Big Vision argues that that the patent application disclosed a "much more general idea," and did not "disclose a single specific structure run at the Davis-Standard trials, nor any details regarding the manner in which Big Vision was combining the banner elements or the proportions used, nor even its use of the Entira resin." (Pl. Opp. 20; Ex. 74). These arguments fall short. To the extent Big Vision's trade secret is discernible (because, of course, "minimal," "expensive," "suitably strong," "novel," and "high" were never defined), each of the five elements claimed in the litigation are also disclosed in the Indian patent application. (*See* Ex. 74). Moreover, in separating, as it were, the wheat from the chaff in the dozens of structures reflected in the Run Reports and Trial Plans, Big Vision's patent application defines the alleged trade secret with more detail than has been put forth in this litigation.

Big Vision effectively "freely disclosed" its information to "all comers," and then published that same information in a patent application. On this record, no reasonable factfinder could find that Big Vision undertook reasonable efforts to maintain the secrecy of its alleged trade secret.

### (b)    The Information Is Publicly-Known

It is well-established that "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique

combination, affords a competitive advantage and is a protectable secret."

*Integrated Cash Mgmt.*, 920 F.2d at 174 (affirming the district court's holding

that the "way in which [plaintiff's] various components fit together as building

blocks in order to form the unique whole" formed a trade secret) (citing *Imperial*

*Chem. Indus. Ltd.* v. *Nat'l Distillers & Chem. Corp.*, 342 F.2d 737, 742 (2d Cir.

1965)).  However, it is equally well-established that "information that is public

knowledge or that is generally known in an industry cannot be a trade secret,"

including information that is available in publications.  *Ruckelshaus*, 467 U.S.

at 1002 (internal citation omitted); *Speedry Chem. Inc.*, 306 F.2d at 331

("[m]atters of ... general knowledge in an industry cannot be appropriated by

one as his secret" (internal citation omitted)).

It is undisputed that all five elements of Big Vision's claimed trade secret

were publicly known; what is disputed is whether the combination of elements

was also publicly known.[54]  Plaintiff's expert opines that the "combination and

useful performance" of the five elements was not known, while DuPont argues

instead that the combination of elements was disclosed in various published

---

[54]   Although Plaintiff's expert explicitly opined in her report that all five elements of the
alleged trade secret were publicly known, she backtracked from that opinion in her
deposition, stating instead that "significant information as to a number of elements"
was unknown, including "whether additives like TiO2 and CaCO3 could be incorporated
at unconventionally high levels into Entira- or LDPE-based structures specifically for a
banner application and whether Entira, as a relatively new resin, could be used in thin
but still highly functional layers in a multilayer banner structure." (Pl. 56.1 Response
¶ 83).  Plaintiff's expert elides the issue.  Plaintiff does not claim "information about
elements" as its trade secret; it claims the actual elements (i.e., *that* Entira was used,
not *whether* or not it could be used).  Thus the Court accepts Plaintiff's initial position,
as set forth in its expert report.

patents and in the trade literature, and utilized ideas well-known to those in the industry.  (Pl. 56.1 ¶ 160; Def. 56.1 Response ¶ 160).

DuPont's own prior patents not only disclose the individual elements of Big Vision's alleged trade secret, but very nearly disclose the combination of those elements as well.  For example, a 2006 DuPont patent discloses the use of (i) a polyolefin, nonwoven central layer; (ii) additives such as $TiO_2$ and $CaCO_3$ up to 50%; (iii) a multilayer, coextruded structure; and (iv) the use of "ethylene alkyl acrylate copolymers and ethylene acid copolymers."  (Def. 56.1 ¶ 68).  Big Vision's claimed trade secret differs only in its addition of LDPE and surface treatments.  (Pl. 56.1 Response ¶ 68).[55]  A 2007 DuPont patent discloses the use of an (i) opaque polyolefin film; (ii) the use of $CaCO_3$ and $TiO_2$ up to 50%; and (iii) the use of surface treatments.  (Def. 56.1 ¶ 67).  Big Vision's claimed trade secret differs in the use of a nonwoven substrate, and the addition of Entira and LDPE.  (Pl. 56.1 Response ¶ 67).

Big Vision has identified its trade secret by cherry-picking five concepts amidst 70 pages of laboratory materials; those same five concepts can be cherry-picked from just two patents.[56]  Big Vision concedes that its alleged

---

[55]    Plaintiff attempts to differentiate its claimed trade secret from the prior art by distinguishing in which layer and for what purpose certain ingredients are disclosed, but its effort is a one-way street.  (*Compare* Pl. 56.1 Response ¶ 68 ("[the DuPont patent application] discloses the use of Elvaloy AC only in the intermediate, non-print-receptive layer of the banner"), *with* Pl. 56.1 Response ¶ 159 (defining its trade secret, in part, as "minimal use of expensive resins")).  Plaintiff has not proffered a unified trade secret definition identifying in which layer and for what purpose various ingredients should be used, and thus its efforts to distinguish the prior art on that basis fail.

[56]    Big Vision cites *Monovis* v. *Aquino* for the proposition that a "belated survey of the art" cannot defeat a trade secret claim where that survey is made possible only by virtue of the defendant's exposure to plaintiff's alleged trade secret.  905 F. Supp. 1205, 1228

trade secret as a whole differs from the 3M Patent in only two ways: the use of LDPE and surface treatments.  This concession, however, is partially in error; the 3M Patent does disclose the use of polyethylene, LDPE, and LLDPE in various layers of the structure; to the extent Big Vision's trade secret includes the use of LDPE, it is disclosed in the 3M patent.  *See* n.5, *supra*.  To the extent identifiable, the combination of elements comprising Plaintiff's claimed trade secret is disclosed by the 3M patent, save for the addition of surface treatments.  Plaintiff also concedes that its alleged trade secret as a whole differs from the Circle Graphics Patent in only two ways: the use of an "expensive resin" and LDPE.  *See* n.4, *supra*.  By combining the teachings of the 3M and Circle Graphics' patents — which the evidence indicates were the two patents on which Big Vision relied — both the elements and their combination in Big Vision's trade secret, to the extent discernible, are disclosed.  (See Ex. 6 at 10).

At least some courts have considered whether the combination of teachings disclosed in two patents discloses the trade secret in combination. For instance, in *Tewari De-Ox Sys., Inc.* v. *Mountain States/Rosen, L.L.C.*, the Fifth Circuit held that the plaintiff's unique combination of two of his own patent applications constituted a protectable trade secret.  637 F.3d 604, 614 (5th Cir. 2011).  In *Norbrook Labs. Ltd.* v. *G.C. Hanford Mfg. Co.*, the court held

---

(W.D.N.Y. 1994).  (Pl. Opp. 22 n.17).  This maxim is inapplicable here, where the so-called "belated state of the art" is of DuPont's *own* patents, or the patents that Plaintiff indisputably relied upon in developing its alleged trade secret (and discussed with DuPont at the time).  *See* Background Sec. A(3), (5)(a)(i), *supra*.

that even taken together, two patents did not reveal the alleged trade secret. 297 F. Supp. 2d 463, 486 (N.D.N.Y. 2003).  These cases are readily distinguishable: here, the 3M and Circle Graphics' Patents do disclose Plaintiff's claimed trade secret in combination, and are obviously not Plaintiff's own patents.

Yet the Court need not resolve that issue because, more fundamentally, Plaintiff has failed to allege how its alleged trade secret constitutes a "unique" combination of publicly-available elements.  Plaintiff's only evidence of the "unique combination of elements" is a oft-cited but conclusory passage from its expert opinion: "[the elements'] combination and useful performance when assembled w[as] not publicly known."  (Pl. Opp. 22).  Repetition alone cannot make it so.  A plaintiff asserting a combination trade secret must demonstrate that the way in which the publicly-available components fit together is unique and not publicly-known.  *Imperial Chem. Indus. Ltd.*, 342 F.2d at 742 ("[A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the *unified process, design and operation* of which, in unique combination, affords a competitive advantage and is a protectable secret." (emphasis added)).  Having failed to describe even the components of its claimed trade secret with particularity, Plaintiff has similarly failed to assert a unified process, design, and operation; as such, its trade secret claim must fail.  *See Sit-Up Ltd.*, 2008 WL 463884, at *9 ("[Plaintiff] has not demonstrated the 'way in which [the] various components fit together as building blocks in order to form the unique whole,' and thus has not raised

a triable issue of fact as to its 'unique combination.'  Therefore, defendants'

motion for summary judgment on this claim is granted." (quoting *Integrated*

*Cash Mgmt.,* 920 F.2d at 174)); *Waterville Inv., Inc.*, 2010 WL 2695287, at *4-5

(E.D.N.Y. July 2, 2010) (finding that there was no trade secret where the

plaintiff had not presented any evidence, beyond its conclusory assertions, that

its trade secret combined publicly available information in a "unique" way).

> ### (c)   The Remaining Factors Do Not Compel a Finding That There Was a Trade Secret

The remaining factors do not weigh as heavily as the preceding two,

because it does not matter how easily duplicated or valuable a trade secret may

be if it not in fact secret.  First, Big Vision took some steps to limit who within

the company knew of the project, but that in and of itself is not determinative.

Big Vision is a small company, and that "only three people knew of the project"

could speak more to the size and structure of Big Vision, than to active efforts

to maintain the secrecy of the alleged trade secret.  (Pl. 56.1 ¶¶ 139, 149; Def.

56.1 Response ¶ 149).

Second, Big Vision alleges that it has invested time and expense in its

recyclable banner project, but that time and expense could conceivably be

traced as much to its development of the proper machinery as the proper

formula to use.  (Compl. ¶ 3).

Third, non-material issues of fact exist as to whether the alleged trade

secret is easily duplicated or discernible.  Visaria testified that once a

recyclable banner product is sold, the public could determine its precise

composition by sending a sample for analysis in a lab, as Big Vision itself did

with another sample. (S. Visaria Tr. 124). Somewhat contradictorily, Plaintiff's expert opines that "[t]he combination of materials, structures, and manufacturing methods taught by Big Vision cannot be readily reverse engineered." (Pl. 56.1 ¶ 124). One third-party witness testified that it would cost up to $3,000 to perform an analysis on a sample to determine its exact structure and composition, and that the analysis would take about a week. (Shokar Tr. 36-37). Defendant's expert opined that it would cost approximately $7,000 to reverse-engineer all aspects of a coated, recyclable banner. (Ex. 6 at 27).

Fourth, non-material issues of fact exist as to the value of the alleged trade secret. DuPont argues that the trade secret is not used by Big Vision, and does not work, as reflected in Big Vision's subsequent tests and modifications to the formula. (Def. Br. 19-20). Conversely, Plaintiff's experts opine that the alleged trade secret "represent[s] a valuable advance in the state of the art" whose value they assess "in the tens of millions of dollars." (Pl. Opp. 21 n.14). The fact remains, however, that Big Vision has yet to commercially manufacture or sell a recyclable banner. (Def. 56.1 ¶¶ 125-26).

In short, while non-material issues of fact exist as to each of these factors, they are not dispositive, because the secrecy of the trade secret is of utmost importance, and the evidence shows that the alleged trade secret was publicly known and not secret.

### 3. DuPont Did Not Misappropriate Big Vision's Alleged Trade Secret

#### a. DuPont Did Not Use Improper Means to Discover the Alleged Trade Secret

Even assuming that Big Vision had adequately identified a viable trade secret, its claim would fail because DuPont did not discover that trade secret through improper means, and did not misappropriate it.  Under New York law, the second element of a trade secret misappropriation claim is that "the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."  *N. Atl. Instruments, Inc.*, 188 F.3d at 43-44 (citing *Hudson Hotels Corp.* v. *Choice Hotels Int'l*, 995 F.2d 1173, 1176 (2d Cir. 1993)); *accord Faiveley Transp. Malmo AB* v. *Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009).  This Plaintiff cannot show.

DuPont did not breach the terms of its agreements with Big Vision.  *See* Discussion Sec. B(3), *supra*.  DuPont and Big Vision were not joint venturers (*see* Def. Br. 24-25; Pl. Opp. 24-25), or co-employees, such that DuPont had any special duty to Big Vision.[57]  Thus, Plaintiff must demonstrate that DuPont

---

[57]    In New York, "[a] conventional business relationship, without more, is insufficient to create a fiduciary relationship.  Rather, a plaintiff must show special circumstances that transformed the parties' business relationship to a fiduciary one."  *Legend Autorama, Ltd.* v. *Audi of Am., Inc.*, 954 N.Y.S.2d 141, 144 (2d Dep't 2012).  While a line of cases within this Circuit holds that a fiduciary relationship may arise when a seller discloses trade secrets to a potential buyer for the sole purpose of evaluating the product, *see Document Sec. Sys., Inc.* v. *Coupons.com, Inc.*, No. 11 Civ. 6528 (CJS), 2013 WL 1945954, at *5 (W.D.N.Y. May 9, 2013) (collecting cases), those cases are factually inapposite because they did not involve an NDA between the parties, and because DuPont was not a "buyer" evaluating Big Vision's "product."  Here, "[a]ny fiduciary duties allegedly breached by Defendant arose, expressly or impliedly, under the contract, and the parties had no relationship of trust apart from their contractual

misappropriated its trade secrets as a result of discovery by improper means. The Restatement defines "improper means" as "fraudulent misrepresentations to induce disclosure, tapping of telephone wires, eavesdropping or other espionage.... In general they are means which fall below the generally accepted standards of commercial morality and reasonable conduct." RESTATEMENT (FIRST) OF TORTS § 757 (1939).

As detailed above, Big Vision alleges that DuPont represented itself as a "mere resin supplier" to gain access to the Davis-Standard Trials in order to misappropriate Big Vision's alleged trade secret for DuPont's own use.  (Pl. Opp. 5).  This allegation is undermined by the fact that DuPont was *invited* to participate in the Trials (after first being solicited for information preparatory to those Trials), a fact Plaintiff recognizes, *see* n.1, *supra.*  Simply accepting an invitation to participate in a potential customer's laboratory trials does not constitute "improper means" that "fall[] below the generally accepted standards of commercial morality." RESTATEMENT (FIRST) OF TORTS § 757 (1939).  In short, Big Vision has not demonstrated that DuPont gained access to its alleged trade secret in violation of a contractual or otherwise relevant duty, or that it used improper means to discover it.  As such, DuPont is entitled to summary judgment on Big Vision's trade secret claim.

---

relationship." *Id.* (citing *Balta* v. *Ayco Co., LP*, 626 F. Supp. 2d 347, 361 (W.D.N.Y. 2009), and *Northern Shipping Funds I, LLC* v. *Icon Capital Corp.*, No. 12 Civ. 3584 (JCF), 2013 WL 440632, at *8 (S.D.N.Y. Jan. 24, 2013) ("Even if the complaint had alleged that a fiduciary duty arises from the overall course of dealing between [the parties], a conclusory allegation that the parties developed a relationship of trust and confidence apart from their contractual relationship is insufficient to plead a fiduciary relationship" (citation and internal quotation marks omitted))).

### b.   DuPont Did Not Misappropriate the Alleged Trade Secret

Separately, Big Vision has failed to show that DuPont used its alleged trade secret.  Big Vision advances two, equally unsuccessful arguments in support of this element: first, that DuPont utilized Big Vision's trade secret information to conduct internal tests; and second, that DuPont's recyclable banner products reflect Big Vision's "innovations."  (*See* Pl. Opp. 6-7, 23).

Turning to the first argument, Big Vision hangs its hat on one thing: "[redacted]."  Big Vision alleges that following a conference call between representatives of P&IP and NOW, the lead developer for NOW's recyclable banner development project had in his notes "[redacted] mil," which was one of the coating thicknesses of Entira tested at the Second Trial.  (Pl. Opp. 7).[58]  A few months later, that same lead developer ran an internal test in which Entira was — allegedly for the first time — tested at that coating thickness.  (*Id.* at 7, 23).

At least one other court has found that internal experimentation with trade secret information can constitute an impermissible use.  *See 02 Micro Int'l Ltd.* v. *Monolithic Power Systems, Inc.*, 399 F. Supp. 2d 1064, 1072 (N.D. Cal. 2005) (internal experimentation with trade secret information not resulting in a marketed product can nonetheless constitute use).  The Second Circuit has not explicitly adopted this holding, but even assuming that it had, Big Vision has not demonstrated that DuPont actually tested a structure with a

---

[58]    The evidence, however, indicates that this was the thickness tested at the First Trial, s*ee* n.27, *supra*.

coating thickness of [redacted] mils in January 2009, only that DuPont tested a coextruded structure with LDPE and Entira.  *See* Background Sec. A(8)(c), *supra*.  Moreover, the coating thickness of Entira is not part of Big Vision's trade secret, only "minimal use of expensive resins."  Because "minimal" is not defined, it is impossible to discern whether [redacted] mils constitutes "minimal."  It strains credibility to argue that DuPont's decision to use less of its own product (by downgauging it with LDPE, among the most widely-used and cost-effective extrusion coating resins) constituted misappropriation of Big Vision's trade secret.[59]

Big Vision's second argument is that DuPont's recyclable banner product lines misappropriate Big Vision's trade secret.  Quite simply, Big Vision cannot demonstrate that its recyclable banners are substantially similar to DuPont's.  The parties do not dispute that DuPont's recyclable banner products are not made by either lamination or coextrusion.  (Def. 56.1 ¶ 41).  None of DuPont's recyclable banner products use the three-layer structures tested at the Trials, the range of $CaCO_3$ tested at the Trials, or "minimal" amounts of Entira (to the extent it has been defined), since DuPont's products either use 100% or 0% Entira.  (Def. Br. 22-23).  Furthermore, DuPont's recyclable banner products are not printable with solvent ink.  (*Id.* at 23; Def. 56.1 ¶ 134).  Thus, to the

---

[59]    In fact, most of the e-mails Big Vision uses to support its misappropriation claim deal instead with DuPont's internal evaluation of the various costs and benefits that might accrue if either Big Vision or DuPont were to use less Entira.  This is nothing more than downgauging, which is an indisputably common practice in the industry, but one that nonetheless results in reduced sales of expensive resins.  *See* Background Sec. A(8), *supra*.

extent Big Vision's trade secret is discernible, DuPont's products implicate almost none of its elements.[60]

"Logically, in any case where what is done or produced by the alleged thief bears some unique markers of the allegedly stolen secrets, it may be inferred that the thief used the secrets…. [But] where an alleged thief's products lack a suspicious similarity to the secrets, the inference would not lie." *Grynberg* v. *BP, P.L.C.*, No. 06 Civ. 6494 (RJH), 2011 WL 1161540, at *7. (S.D.N.Y. Mar. 30, 2011), *aff'd*, 469 F. App'x 5 (2d Cir. 2012) (summary order). Even taking the facts in the light most favorable to Plaintiff, DuPont's recyclable banner products differ substantially from Big Vision's alleged trade secret. *See Thin Film Lab, Inc.*, 218 F. Supp. 2d at 527 (finding no trade secret misappropriation where coating thicknesses of the final products differed substantially). Plaintiff has failed to demonstrate substantial similarity and thus cannot show that DuPont misappropriated its alleged trade secret. DuPont is entitled to summary judgment on Big Vision's trade secret misappropriation claim.

## D.    Big Vision's Unfair Competition Claim Fails

Big Vision's final claim, for unfair competition, depends heavily on the preceding two claims and fails for similar reasons. "The essence of an unfair competition claim is that one may not misappropriate the results of the labor,

---

60    Plaintiff argues that because DuPont's banners do not exhibit the four-item "wish list" that Big Vision's trade secret is supposed to cause, DuPont must have ineptly misappropriated its trade secret. (Pl. 56.1 Response ¶ 40). While clever, this argument is not a fair reading of the record, which makes clear that DuPont's recyclable banners are simply not substantially similar to Big Vision's alleged trade secret.

skills and expenditures of another [...] the tort functions to protect 'property rights of value ... from *any form* of commercial immorality.'" *Norbrook Labs.*, 297 F. Supp. 2d at 491 (internal citations omitted) (emphasis in original). As such, a claim for unfair competition "requires allegations of 'unfairness and an unjustifiable attempt to profit from another's expenditure of time, labor and talent.'" *Greenblatt* v. *Prescription Plan Services Corp.*, 783 F. Supp. 814, 825 (S.D.N.Y. 1992) (internal quotation marks and citation omitted).

Bad faith is an essential element of an unfair competition claim. *See Jeffrey Milstein, Inc.* v. *Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34-35 (2d Cir. 1995); *Metito (Overseas) Ltd.* v. *Gen. Elec. Co.*, No. 05 Civ. 9478 (GEL), 2009 WL 399221, at *13 (S.D.N.Y. Feb. 18, 2009). "Mere negligence or recklessness" is insufficient to sustain this claim; instead, a plaintiff must establish bad faith by showing that the defendant acted "'out of a dishonest purpose.'" *Barbagallo* v. *Marcum LLP,* No. 11 Civ. 1358 (JBW), 2012 WL 1664238, at *8 (E.D.N.Y. May 11, 2012) (internal citation omitted). "[B]ad faith cannot be found where a defendant's alleged misconduct represents nothing more than its having exercised its legal rights." *Tang* v. *Jinro Am., Inc.*, No. 03 Civ. 6477 (CPS), 2005 WL 2548267, at *8 (E.D.N.Y. Oct. 11, 2005).

Plaintiff rests its unfair competition claim on several internal DuPont e-mails in which Steve Wilkinson and Kevin McAllister either summarize information conveyed to them by Big Vision, or raise concerns about sharing information about Big Vision between the P&IP and NOW divisions. *See* Background Sec. A(8), *supra*. As the parties have failed to submit testimony

from either Wilkinson or McAllister to explain their e-mails, trying to discern bad faith (or not) from these disembodied communications is largely an exercise in tea-leaf reading.  (Nov. 5 Tr. 64).[61]  DuPont concedes that these e-mails, facially, appear to suggest that DuPont employees knowingly shared Big Vision's allegedly confidential information.  (*Id.* at 65).[62]  Significantly, however, sharing information about Big Vision between divisions at DuPont did not constitute a breach of contract or misappropriation of a trade secret, and on that basis, cannot constitute bad faith.  Moreover, the Court sees no reason why sharing information within a company could constitute a "dishonest purpose" that could support a finding of bad faith.  *See Tang*, 2005 WL 2548267, at *9 ("Because I have previously concluded that no valid contract existed between Plaintiff and Defendants [...] Defendant's motion for summary judgment dismissing Plaintiff's unfair competition claim is granted."); *see also Tri-Star Pictures, Inc.* v. *Leisure Time Prods., B.*V., 17 F.3d 38, 45 (2d Cir. 1994)

---

[61]     At the November 5, 2013 oral argument, the Court noted that given the frequency with which Big Vision cites these two e-mails, it was surprising that the deposition transcripts were not offered, because both McAllister and Wilkinson were deposed. (Nov. 5 Tr. 37-38).

[62]     DuPont has put forth convincing evidence, in the form of unrebutted testimony from a number of employees, that the alleged sharing of information dealt with DuPont's intention to utilize Big Vision as a toll coater, and to sell Entira to Big Vision.  *See generally* Background Sec. A(8), *supra*.  The coating thickness of Entira used by Big Vision was necessary to calculate the potential value in using Big Vision as a toll coater versus only a customer, and Big Vision has done nothing to rebut Welchel's testimony in this regard.  The fact that DuPont internally evaluated the potential value of its relationship with Big Vision should not be a basis of a finding of bad faith — a careful business analysis is an entirely reasonable and, in fact, desirable thing to undertake, and one the Court will not disincentivize with a contrary ruling.  In that vein, holding DuPont accountable for two e-mails sent by (perhaps overly) cautious employees could create a perverse incentive for employees not to raise potential issues within a company, or not to safeguard customer information as a matter of course (even if it is not required by the terms of an NDA).  *See generally* Background Sec. A(8), *supra*.

(holding that an unfair competition claim was properly dismissed where there was no finding of contractual breach); *Turner* v. *Temptu Inc.*, No. 11 Civ. 4144 (JMF), 2013 WL 4083234, at *12 (S.D.N.Y. Aug. 13, 2013) ("Because there was no agreement between the parties, and no other legally cognizable bad faith alleged, Defendants' motion for summary judgment is granted as to Turner's unfair competition claim.").

Big Vision also argues that DuPont had an obligation to disclose the fact that its NOW division could compete with Big Vision, and relies upon e-mails in which various DuPont employees recognize that NOW and Big Vision may be competitors.  (*See* Pl. Opp. 13; Pl. 56.1 ¶¶ 187-90).  Although numerous DuPont employees have offered unrebutted testimony that they did not believe DuPont and Big Vision to be competitors, (*see generally* Def. 56.1 Response ¶¶ 187-90), even if they were, Big Vision has cited no case for the proposition that DuPont had any duty to disclose that it could compete with Big Vision.  In fact, Big Vision appears to have made no effort to discover this fact.  Defendant is entitled to summary judgment on Plaintiff's claim for unfair competition.

**CONCLUSION**

As noted, the instant litigation has engendered both an extensive record and a surfeit of briefing.  The Court has reviewed all of this information and argument with great care over many months, and has concluded that, as to each material fact implicated by Plaintiff's claims, there is no genuine issue in dispute, and summary judgment is warranted as a matter of law.  Thus for the reasons discussed herein, Defendant's motion is GRANTED.

SO ORDERED.

Dated:  February 10, 2014
         New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge